231 S.W.2d 828 (1950)
WORLEY
v.
SWIFT & CO. et al.
No. 21348.
Kansas City Court of Appeals. Missouri.
May 15, 1950.
Price Shoemaker and Elmer E. Rietal, St. Joseph, for appellant.
Brown, Douglas & Brown, R. A. Brown, Jr., St. Joseph, for respondents.
CAVE, Judge.
This is an appeal from a judgment of the circuit court reversing an award for compensation allowed claimant by the Industrial Commission in a proceeding under the Workmen's Compensation Law. Mo. R.S.A. § 3689 et seq.
A hearing was held before a referee who made a finding that the claimant sustained an accidental injury on July 31, 1947, which arose out of and in the course of his employment, "and that he has been fully compensated for all disability resulting from said accident; therefore, additional compensation is hereby denied."
Thereafter, claimant filed application for review by the whole commission which found that claimant had sustained an accidental *829 injury arising out of and in the course of his employment and that he had suffered a "10% permanent partial disability of the body as a whole," and allowed him compensation of $20 per week for 40 weeks. The commission also found that claimant had been paid compensation in the sum of $328.57 for which credit was allowed, and ordered that the balance of $471.43 be paid to claimant. The employer and insurer appealed. The circuit court found that the award of the commission, allowing claimant compensation for 40 weeks, was not supported by competent and substantial evidence upon the whole record; that said award was contrary to the competent and substantial evidence, and reversed that award and reinstated the findings of the referee and entered judgment accordingly, from which claimant appealed to this court.
Claimant was an employee of Swift and Company. His duties were to wash, clean and oil meat trailers, which were about 5 or 6 feet long, 3 feet wide, and 2½ feet high; they were on wheels and were made of steel and weighed from 500 to 600 pounds. He used steam and hot water to wash and clean the trailers, and during the operation it was necessary to tip the trailer over by lifting it. While so engaged, claimant slipped on the wet and greasy floor and injured his back.
We shall not detail the evidence concerning the accident because it amply supports the findings of the referee, of the commission and of the circuit court, that claimant sustained an accidental injury which arose out of and in the course of his employment. The real controversy is whether the commission could have reasonably made its finding that claimant had suffered 10% permanent partial disability and awarded compensation for 40 weeks.
On this feature of the case the evidence is that immediately after the accident the claimant reported it to the foreman who took him to a dispensary located in the building, where a nurse applied a heat treatment to his back for about one-half houn, which gave him some relief, and he went home. The next day he returned to work but did nothing except drive two tractors to the shop for repair; and the following day a representative of the employer took claimant to the hospital where he was visited and treated by Dr. Senor, the employer's doctor. He remained in the hospital 7 or 8 days and was kept on a hard mattress, supported by boards. He left the hospital and was given a prescription for some tablets, but never returned to work for the employer. He was paid temporary total compensation until November 26, 1947, plus medical expense.
The arguments in the briefs concern principally the actions and conduct of the claimant in the fall of 1947 and the year of 1948. It is conceded that in September, 1947, claimant entered into a contract with the United States Government for delivery of crushed stone to be used on certain river work; that between October of that year and the following spring about 25,000 tons of stone were delivered to the Government Engineers, under said contract. The employer contends that claimant's evidence shows that during this time he was operating a large truck over rough roads in delivering the stone. However, he testified that he did no "heavy work" in connection with the fulfillment of this contract; that the stone was hauled by three men who were his partners in the contract, and by another man whom he hired to drive his truck; that he drove "a little bitvery little* * * a day now and then"; that the trucks were loaded at the quarry by a hydraulic lift and were unloaded on the job by the driver pulling a small lever which dumped the stone. After he had completed his contract some time in March, 1948, he did some hauling for Mr. Williams and Mr. Haynes who had similar contracts, but all he would do was drive his truck as the loading and unloading were done by machinery. In July, 1948, he went to Auburn, Nebraska, and drove a truck for his brother-in-law who had a similar contract. The loading and unloading were done in the same manner. On cross-examination he was asked if he had been paid compensation through November 26, 1947, and admitted *830 that this was true. He was then asked:
"Q. And during all that time you were unable to do any work of any kind or character? A. That's right.
"Q. And during none of that time were you doing any work? A. No.
"Q. That is correct, isn't it? A. That's right, and I have not never done anything for a long time after that either.
"Q. And you told Mr. Shoemaker you didn't do anything until sometime in March of 1948 you began driving a dump truck? A. Yes, sir. * * *
"Q. You had four trucks working on that contract, didn't you? A. Yes.
"Q. And one of the trucks you drove constantly, didn't you? A. No, I didn't Harold Gillian drove my truck the biggest part of the time. * * *
"Q. You hauled some yourself, didn't you? A. I had a driver on my truck.
"Q. You hauled some yourself, drove the truck? A. I was up there, and I told you I drove a day or so now and then.
"Q. And you drove during November of 1947, didn't you? A. NovemberI don't think I did."
Claimant repeatedly testified that he had not been able to do any heavy work, such as lifting, since the accident and that at the suggestion of Dr. Senor he had been wearing a belt to support his back. Dr. Senor did not testify, and we do not have the benefit of his diagnosis.
On July 19, 1948, claimant was examined by Dr. Kulowski, an orthopedic surgeon. Dr. Kulowski had X-rays made, got a history of the case and examined claimant, and testified: "With regard to the back, I will state positive findings. He appeared to have a vertical sacrum. The lower ribs rode on the iliac crests practically. In standing there was a marked bilateral muscle spasm. He was tender at the lumbosacral junction, mid-line, and slightly tender over both sacro-iliac regions. He had a marked limitation of extension of the lumbosacral spine. I estimated that at about fifty per cent. It was associated with discomfort. He had about eighty per cent forward bending. He had a slight limitation of lateral bending. Rotation of the dorsal spine was free. * * *
"Q. Is it reasonably probable in your opinion that the condition or a part of it resulted in the accident he described to you? A. I think so.
"Q. Now, Doctor, could you give us an idea, taking into account all this history and your physical examination, as to the extent of this man's permanent partial disability, if any? A. On the strength of what findings I have, the history, physical examination, and X-rays, I have it as my opinion that his partial permanent disability rested at about twenty-five per cent of the backlumbosacral spine." The Doctor also testified that in his practice he had found that many people "with really bad backs" can drive and operate a truck or a tractor "with a fair degree of comfort. * * *
"Q. Do you feel that a man could have a disabled back and still drive a truck over rough roads with heavy loads? A. I certainly do. It is possible. * * * I'd like to emphasize that point. I see that all the time."
On cross-examination there was propounded to the Doctor a hypothetical question, which assumed certain facts denied by the claimant, such as, "that during this time he himself drove one of these heavy trucks over rough roads" and, in answer to the hypothetical question, the Doctor stated that, assuming those facts, his opinion of the injury would be altered; however, he stated: "I would still have to weigh very carefully the findings in the case regardless. I can't ignore the findings that we have in the pictures; for instance, where there is a question of narrowed discs, a question of the man having a congenital anomaly which mightpresumably would make him more susceptible to any injurywhat effect it would have on him."
We think the Doctor's diagnosis of claimant's condition, based upon his own examination and the history of the case, is more substantial evidence than his answer *831 to the hypothetical question which included disputed facts.
The employer produced a witness who testified that on August 11, 1948, he was in Auburn, Nebraska, and saw claimant stop his truck at a filling station and get out without any apparent difficulty and pick up a drive shaft about 2½ inches in diameter and 5 or 6 feet long and carry it into the station; that he followed claimant to the rock quarry and saw him back his truck up to the loading lift, and that he was holding his right hand on the wheel while looking out the side door to see where he was backing; that plaintiff did these things without apparent difficulty. This witness's testimony is of little value because the occurrence testified to was more than a year after the accident; long after the 40 weeks for which allowance was made.
Dr. Buck, an orthopedic surgeon of Kansas City, examined claimant at the request of the employer on January 6, 1948, and again on December 6 of the same year. The pertinent part of his testimony follows:
"Q. What examination did you make and what did you find? A. The general physical examination was essentially negative. In that referable to his back, I found that all motions of the lumbar sacral spine were limited approximately fifty per cent, and the patient complained of pain in that area. * * *
"Q. What was your opinion as to what was wrong with him, based on the history and your examination? A. My diagnosis was low back pain.
"Q. Did you have X-rays taken? A. Yes, sir.
"Q. Did they disclose anything? A. Nothing except questionable narrowing of what was assumed to have been the lumbosacral joint between the fifth lumbar and the fourth, then the first sacral.
"Q. That is what was referred to by Dr. Fisher as a congenital anomaly? A. Yes, sir.
"Q. Did you attribute that to this alleged accident in any way? A. No, sir.
"Q. What was your final conclusion, then, as to his disability, based on his history and what you found at that time? A. At the time of his examination, based at that time on the subjective complaints of pain and objective findings of limitation of motion, I gave him five per cent permanent partial disability." When the Doctor examined the claimant again on December 6 he found substantially the same condition.
"Q. Did you change your conclusion any, based on your examination and his complaints? A. No, sir." There was then propounded to him the same hypothetical question which had been asked Dr. Kulowski, and he was asked: "Assuming those facts to be true, would that alter your opinion as to his disability? A. No, sir.
"Q. You still think he has some disability? A. Based on subjective complaints of pain and limitation of motion." After testifying at some length concerning the history of the case, the X-rays and his objective findings, the Doctor was asked:
"Q. In other words, you estimated the disability at five per cent? A. Yes, sir.
"Q. That is what it amounted to in the final analysis? A. Yes, sir. * * *
"Q. Do you feel that at the present time he has any disability in his back? A. On his statement * * * of complaints, subjective findings and the objective limitation of motion, he probably does.
"Q. Do you feel that is the result of this accident as given in his history? * * * A. That is what that is based onthe five per cent disabilitynot on the hypothetical statement (question)."
The law is now well settled that the reviewing court may not substitute its own judgment on the evidence for that of the commission; but the court is authorized to decide whether the commission could have reasonably made its findings and reached its result, upon consideration of all of the evidence before it; and to set aside decisions only when they are clearly contrary to the overwhelming weight of the evidence. Wood v. Wagner Electric *832 Co., 355 Mo. 670, 197 S.W.2d 647, 649; Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55, 62; Johnson v. Great Lakes Pipe Line Co. et al., Mo.Sup., 215 S.W.2d 460, 463.
As stated supra, there can be no question but that claimant sustained an accidental injury which arose out of and in the course of his employment. The question is, did he suffer a permanent partial disability, and if so, to what extent? The referee and the circuit court found he had been paid in full for his injuries; the commission found he had not been fully compensated and made the award referred to above.
We have set out somewhat in detail the evidence touching this question, and are of the opinion that the commission could reasonably have made its findings and award, when all the competent evidence is clearly understood and considered.
Dr. Kulowski's opinion was that claimant had suffered a 25% permanent partial disability to his back; Dr. Buck estimated such disability at 5%. This evidence establishes the fact that there was some permanent partial disability. However, the employer contends that if the commission made any award it should have followed the opinion of one of the doctors; that it had no evidence upon which to base its award of 10% disability. We do not understand this to be the law. The finding by the commission that the employee suffered a 10% disability to his body as a whole was a finding of fact which was clearly within the province of the commission. It was not conclusively bound by the percentage estimate of the doctors. It must consider the evidence as a whole in arriving at its conclusion, and if such finding is supported by substantial and competent evidence, a reviewing court is not authorized to interfere with it. Henderson v. Laclede Christy Clay Products Co., Mo.App., 206 S.W.2d 673; Johnson v. Fogertey Building Co., Mo.App., 194 S.W.2d 924; Chapman v. Raftery, Mo. App., 174 S.W.2d 352.
The employer's principal contention is that claimant's testimony clearly proves that he had been working continuously since October, 1947, and therefore the commission was not justified in making an additional award. We do not so understand the evidence. It is true that claimant had a contract with the government for the delivery of stone to a river project, and that such stone was hauled by truck over some rough roads. But claimant testified that he did not drive a truck during the fulfillment of that contract, except on rare occasions, "a day now and then"; that he hired a man to drive his truck and the other three drivers were partners in the project and drove their own trucks. It is true that he made a profit under this contract, but that would not defeat his claim. The loss of earnings is not an essential element of a claim for permanent partial disability. Sec. 3705, R.S.1939, Mo.R.S.A.; Carr v. John W. Rowan Plastering Co., 227 Mo.App. 562, 55 S.W.2d 727; Sleets v. St. Louis Material and Supply Co., Mo.App., 39 S.W. 2d 821; Betz v. Columbia Telephone Co., 224 Mo.App. 1004, 24 S.W.2d 224; Lynch v. Gleaner Combine Harvester Co., 223 Mo.App. 196, 17 S.W.2d 554. It is also true that claimant admitted that he had been operating his own truck for a period of about six weeks while working for his brother-in-law in Nebraska in the summer of 1948. But this fact would not defeat his claim. Dr. Kulowski testified that it was not uncommon for men with "terrible backs" to operate trucks and tractors without great discomfort. In other words, the fact that he drove a truck in 1948 would not defeat his claim for permanent partial disability which was clearly established by other evidence. (See last cited cases, supra.)
It is our conclusion that the judgment of the circuit court should be reversed and the cause remanded with directions to that court to enter a judgment affirming the findings and award of the Industrial Commission. It is so ordered.
All concur.