GORDON

v.

## CHEVROLET–SHELL DIVISION OF GENERAL MOTORS CORP.

No. 28876.

St. Louis Court of Appeals.

Missouri.

May 18, 1954.

Motion for Rehearing or to Transfer to Supreme Court Denied and Opinion Modified.

July 7, 1954.

Harlan & Harlan, John L. Harlan, Sr., Clayton, for appellant.

Milton R. Fox, Julius H. Berg, St. Louis, for respondent.

ANDERSON, Presiding Judge.

This is a proceeding under the Workmen's ·Compensation Law, Sections 287.010– 287.800 RSMo 1949, V.A.M.S. The appeal is by the employer, ·Chevrolet-Shell Division of General Motors Corporation, from the judgment of the Circuit ·Court of the City of St. Louis affirming an award in favor of the employee, Bennie W. Gordon.

The claim for compensation alleged injuries to claimant's back, left leg, and ankle, sustained December 20, 1951, as a result of a fall. The employer, a self-insurer, in its answer, denied each and every allegation in said claim.

There was a hearing before a referee of said commission which resulted in an award in favor of the employee for permanent partial disability in the sum of $30 per week for eighty weeks, said payments to begin as of December 21, 1951. The award was based upon a finding that the employee had suffered a twenty per cent. permanent partial disability. Upon application for review, the Industrial Commission affirmed the award of the referee, and entered a final award in favor of claimant. The final award, as heretofore stated, was affirmed by the Circuit Court.

It was admitted at the hearing before the referee that Bennie W. Gordon was, on December 20, 1951, an employee of Chevrolet-Shell Division of General Motors; that both parties were subject to the provisions of the Missouri Workmen's Compensation Law; that the employer had notice of the employee's injury; that the claim was filed within the time prescribed by law; and that the average weekly wage of the employee was in excess of $42.50. The disputed fact issues were: (1) whether the employee sustained a compensable injury on December 20, 1951; and (2) if such injury was sustained, the nature and extent of disability resulting therefrom.

Claimant at the time of the hearing was twenty-nine years old, and was at the time of the alleged accident and injury employed as a "nicker" operator in appellant's plant. The duties of such an operator were to make cuts or nicks in bars of steel by the use of an electric torch. The bars of steel, four inches wide, are moved on a conveyor, past the nicking machine. The operator of said machine stands on a platform located at the side of the conveyor and, in making the operation, moves a lever which causes the steel bar to stop and a torch to burn a cut into the steel. The lever is then moved, a button pressed, and the steel bar again moved forward until a point is reached where another cut is desired. The steel bars come into the shop on a cross-conveyor and are delivered to the conveyor which carries them past the nicking machine. During the operation a steel bar will oc-casionally get stuck or caught, making it necessary for someone to straighten it so that the bars will move forward on the conveyor. This is usually done by a material handler.

On Thursday, December 20, 1951, at about 9:30 a. m., while claimant was engaged in operating his machine, several of the steel bars became stuck. There was no material handler present at the time, whereupon claimant himself attempted to remedy the situation. He testified that he jumped off the platform on which he was standing, took a crowbar, got up on the main conveyor and attempted to pry the bars apart. He stated that as he was doing this he lost his balance and fell to the floor, a distance of approximately six feet, striking his back and left leg against a part of the machinery as he fell. Mr. Huber, the general foreman, immediately came up to claimant and inquired if he was hurt. According to claimant, Mr. Huber, just prior to the fall, was standing in front of claimant's machine talking to him and calling his attention to the bars that were stuck. By the time Huber arrived claimant had arisen from the floor and, in reply to Huber's inquiry, stated that he did not think he was hurt. Claimant did not tell Huber he had fallen, but had assumed that Huber had seen him fall.

Claimant further testified that, thereafter, he continued working, but after a few moments felt pain in the lower part of his back, a little below the belt line, and pain in his left leg. He told Huber about this and the latter sent someone to relieve him. Claimant then reported at the dispensary.

Huber testified that he was standing at the time about six feet northeast of the machine claimant was operating, and that the actual distance from the floor to the top of the main conveyor was forty-four and one-half inches. With steel on the conveyor, the distance from the floor was forty-eight inches.

Huber is six feet tall, and from where he was standing he was able to see the floor on the opposite side. He stated that claim-

ant stood on the steel on top of the conveyor and straightened the steel bar with a pinch bar. After doing so, claimant stepped down to his working position and, as he did so, slipped and started to fall, but caught himself. He stated that claimant did not fall to the floor.

On cross-examination, Huber testified that he could not see through claimant, and therefore could not know whether he struck anything in back of him, but was certain claimant did not strike the floor. He further testified that he immediately went up to claimant and told him he had better go to the dispensary, which he did. He stated that claimant worked the rest of the day, and full time the following day, Friday, according to the employer's records.

Claimant testified that after receiving treatment at the dispensary he returned to his job and worked the rest of the day. That evening claimant consulted Dr. Rusan. Dr. Rusan treated claimant's leg and bandaged his back. Claimant remained home the following day, but reported for work the following Monday. During the next two or three weeks claimant was given lighter work, but at the end of that period returned to his regular job. Two men were assigned to help him, one to keep the bars of steel moving freely, and the other to work with him on the bars so that he would not have to bend his back. This arrangement lasted about a week and a half. During that time the machine on which claimant worked was being changed so that an automatic device moved and lowered the steel. After that, the extra man was taken off and claimant continued to operate the machine in the same manner he had prior to the accident. After returning to his regular job, claimant worked continuously, putting in overtime of approximately eight hours per week during the period from December 30, 1951, to June 15, 1952.

Huber testified that two men worked at the machine both before and after the accident. He stated that claimant did the same kind of work after the accident that he did before being injured. He further testified that claimant worked the day fol-

lowing the accident, and that the "absence" report prepared by claimant himself did not mention December 21, but did show that, because of illness, claimant was off work from December 22nd (Saturday) to 7:00 a. m. December 24th. Whether Sunday was a working day for claimant does not appear from the record. The record of the dispensary shows that claimant was treated there on the 22nd and 23rd of December.

On claimant's first visit to the dispensary his back was taped, and he was given heat treatment. The records of the dispensary show that claimant visited the dispensary on sixteen different days, through January 16, 1952. After that date his next visit was June 7, 1952. At the dispensary he was given heat treatments, aspirin, anesthesin and caffeine pills, also a vitamin B–1 preparation.

Dr. Thomas Rusan testified that he first examined claimant on the evening of December 20, 1951. At that time claimant was able to rise without assistance, but with difficulty, and seated himself in the consultation chair slowly, but with difficulty. Claimant undressed himself with difficulty. There was partial flexion of the hip. There was swelling and tenderness over the lumbar and sacral regions, but no radiation of pain, and no muscular atrophy. Protective movements on bending were noted. The flexion with bending on the trunk was possibly 70 degrees, with associated pain and limitation. The pain was increased on hyper-extension. Rotation was painful, and there was restriction of movement. He stated that the leg raising test was negative. There was some Romberg on the right leg, and the left leg was positive and painful bilaterally.

The doctor further testified that on lying down there was a spasm of the sacrum, lumbar and sacroiliac muscles, and that pain increased on flexion above 90 degrees. There was pain on external rotation or abduction and straight leg-raising 80 degrees. The doctor's diagnosis at the time was that claimant suffered a lumbar sacral sprain, and laceration of left leg. The indicated

treatment was sodium salicylate iodine, colchiciene hypodermically, and heat to be given as necessary.

Claimant's next visit to Dr. Rusan was on December 22nd, at which time he told the doctor that his pain had diminished somewhat. He was given the same treatment as was administered on the first visit. Subsequent visits were made on the 24th, 27th and 29th of December, also on January 3rd, 5th, 11th, 15th, and 19th. On the latter visit the diathermy treatment was increased from fifteen minutes to thirty minutes. On each visit claimant received intravenously sodium salicylate iodine, and colchiciene. The next visit was on January 22, 1952, at which time claimant stated he was doing better, but complained of pain on stooping, and inability to lift. A physical examination at that time revealed that movements were less limited. The same treatment theretofore administered was given him on that date. Claimant was given the same treatment on January 25th and 30th. On the latter visit claimant stated he was feeling better. He again visited the doctor on February 3rd, at which time he complained of pain on turning in bed. He was treated on February 6th and February 9th, at which times the doctor noted that muscle spasms were still present. On February 15th he was again treated, and said he was doing better and was able to do more work. At the time, however, there was still present pain on bending, and restriction of movement. The same treatment as theretofore rendered was given him on this occasion. On February 22nd he was again treated, and received his last diathermy treatment. The doctor stated that claimant had received altogether seventeen diathermy treatments. On February 29th claimant returned to the doctor's office and said his back felt much better, and that he noticed tenderness chiefly on bending and lifting. Claimant was next treated on March 10th, and received sodium salicylate by mouth. The same treatment was administered on April 19th, at which time claimant stated that his back felt about the same. An examination on this occasion revealed some limitation and muscle spasm. The doctor noted in his record at that time that there was possibly a twenty-five per cent. permanent disability. Claimant was again treated May 12th and 29th, and stated he was feeling better. The last treatment by Dr. Rusan was on June 14th, at which time claimant stated he was "doing fine". Dr. Rusan stated that he noted then "he had flexion approximately 85 degrees, extension 160 degrees, hyperextension of 140, right and left side bending 110 degrees." The doctor further testified:

"Q. Do you believe that Mr. Gordon now, based on your last examination, has any permanent partial disability? A. Yes. * * * I made a note he has 25%.

"Q. You think he has 25% permanent partial disability of what? A. Back. Lumbar sacral region.

"Q. What do you base your opinion on, doctor * * *? A. On the amount of flexion, amount of bending and muscle rigidity and muscle pain in the back.

"Q. Did you find an amount of muscle spasm present on every examination? A. I did. I also based it on the fact it has been approximately seven months since the accident and with heat treatment and the amount of sodium salicylate I think he has progressed as far as he is going to progress."

The doctor further testified that he did not believe further treatment or time would reduce the amount of disability, and that he believed the injury was permanent.

Dr. Henry Hampton testified that he first examined claimant on January 8, 1952. At that time claimant complained of pain in the lower back. The doctor further testified: "I felt in the lower back of both sacroiliac articulations. There was some muscle spasm present on all occasions. I examined and treated him five times and during that time I found this tenderness and to a lessening degree, so when I last saw him there was very little tenderness.

* * * I examined him on the 17th and 19th of May, and he had very little tenderness then." X-rays which he made of claimant were negative for injury to the bone, and all vertebrae were normal. He testified that all movements found in the normal spine and pelvis were present at all examinations. He further stated: "There was moderate restriction of rotation of the pelvis, both to the right and left on active movement. When the trunk was rotated to the left the disability and pain apparently increased in the right sacroiliac joint. Forward flexion and extension could be accomplished but these latter movements were slow and calculated, and apparently uncomfortable with extensive pain. Palpation and compression of the spinous processes of the spinal cord and lumbar vertebrae showed no evidence of injury except for a moderate amount of pain over the muscles of the spine, being the vertebrae muscles * * *. He was able to raise his leg and keep his pelvis on the table, up to 90% normal * * *. He was able to bend forward to fasten and unfasten his shoes and slip trousers on and off without discomfort * * * those bring to play all muscles of the pelvis and thigh. * * * I know he had pain in the lower back and was uncomfortable whenever the weather was cold, cloudy or rainy. * * * Whenever a muscle is fractured or injured when the weather changes there is stiffness. * * * Following my several examinations of this man I made this notation. * * * I said, 'this man suffered a low back trauma apparently of moderate severity at place of employment.' The injury was confined to the soft tissue in the lower back, that is muscles and fascia. He probably experienced some difficulty immediately after the accident with moderate restriction of movement in the affected area. * * * On the basis of repeated examinations, laboratory information and X-ray examinations, I believe that whatever injury Mr. Bennie Gordon might have suffered in the fall of 1951, when he slipped and fell, was confined to the sacroiliac joint and to the soft tissue overlying same. I believe that a reasonable estimate of his disability should be rated at 15% loss at the level of the sacral and lumbar vertebrae * * *. To me, 15% represented to me a generous maximum, be somewhere close to that. I am giving him full advantage above his complaints of pain, limited motion and inability to pick up things, although he did demonstrate on occasions he did pick up things very well."

Dr. Marlin C. Spoeneman, director of the medical department of the employer and in charge of its first aid dispensary, also testified for the employer. In addition to finding a superficial abrasion of the left leg, he noted a contusion of the lumbar region, but no abrasions or discoloration of the skin, and no swelling in that area. There was tenderness in that region, and his treatment consisted of aspirin tablets and infra-red heat treatments. The doctor made no tests to determine disability, and made no notation with respect to muscle spasm. He stated, however, that his records indicated simply a localized tenderness in the lumbar region. He did not see claimant between January 16th and June 7th, during which time claimant was under treatment by Dr. Hampton. On June 7th claimant did not have any muscle spasm.

On his first visit to the dispensary claimant's leg was dressed and his back taped. The injury to the leg consisted of a gash three or four inches below the kneecap. The wound was a superficial one and any claim for compensation by reason thereof was abandoned by claimant. Thereafter, claimant was given a series of treatments at the dispensary, which included heat treatments, pills, and "shots". Claimant was uncertain as to how many visits he made to the dispensary, but stated that it was more than a half dozen times. He further stated that when he did go to the dispensary it would sometimes be as often as two or three times a day. The records of the dispensary showed that there were only two occasions on which claimant reported to the dispensary twice in one day, namely, December 20th and December 24th. The records further showed that claimant visited the dispensary

on sixteen different days through January 16, 1952, and thereafter not until June 7, 1952. In the meantime, Dr. Spoeneman, who was in charge of the dispensary, had sent him to see Dr. Henry Hampton. Claimant was also being treated by Dr. Rusan. In general, he was given heat treatments at the dispensary, and pain pills consisting of aspirin, anesthesin and caffeine. He was also given a Vitamin B–1 preparation. Claimant does not wear any mechanical device on his back for the reason that the use of such was discouraged by Dr. Spoeneman and Dr. Rusan. Claimant testified that he still took pills whenever he felt pain. He also stated that he still had pain in his back, but that his condition had improved. He further testified that he could do everything that he had done before the accident, but there were some things which caused pain when he did them. When asked to specify what those things were, he replied that if a steel bar gets stuck while the extra man is at lunch and he himself straightens it, he experiences pain.

Huber testified that claimant worked very steadily at his job and was a good worker, in fact, was one of his best employees. He stated that claimant had never complained to him of inability to do his job, and that he had never noticed anything which would indicate that claimant was unable to perform his work.

Claimant's earnings' record showed that he worked steadily since the date of the accident, and that his earnings in most weeks were in excess of $90 per week. In the first two weeks of February claimant earned $105 per week, working fifty-three hours each week. During the last two weeks shown by the record, the weeks of June 8th and June 16th, 1952, claimant earned $95.16 per week for a forty-eight hour week. Only during five weeks of the twenty-six week period did claimant earn less than $70. During these weeks claimant worked a shorter number of hours due to holidays or absences for one reason or another.

Claimant testified that he had previously been in the military service, during which time he developed flat feet. Thereafter, he received a disability rating of ten per cent from the government, and was receiving compensation on that basis.

The appellant assigns as error the action of the trial court in affirming the award of the commission. In support of this assignment it is urged that the finding of the commission that claimant sustained a 20% permanent partial disability was unreasonable and contrary to the overwhelming weight of the evidence. It is argued that this conclusion necessarily follows from consideration of the following facts developed by the evidence, towit: (1) that claimant suffered no broken bones, but received an injury merely to the muscles and soft tissues of the lower back; (2) that there was no abrasion or discoloration at the site of the injury; (3) that claimant was steadily employed after the accident in the performance of the same work he did prior thereto; (4) that claimant suffered no loss of wage as a result of the accident; (5) that claimant has since the accident been able to perform all of the duties of his job in a satisfactory manner; and (5) that claimant's condition had steadily improved in that the pain and tenderness in his back has continued to diminish.

It is true that the foregoing facts, considered alone, tend to prove that Gordon's injuries were not as serious as claimed. But the commission was not limited to the evidence which established the foregoing facts. Its duty was to consider all the evidence, including the testimony of the physicians who treated claimant and who were in a position to give expert testimony as to the nature and extent of claimant's injuries.

The testimony of Dr. Rusan shows that when he first treated claimant he found swelling and tenderness over the lumbar and sacral regions of claimant's back. There was pain and limitation of movement present at the time. The doctor's diagnosis was that claimant had suffered a lumbar sacral sprain. Claimant thereafter received numerous treatments which extended over a period of approximately six months, during which time the symptoms

first noted by the doctor persisted, though there was some improvement. Dr. Rusan further testified that upon his last examination, which was in June, 1952, there was still present limitation of movement, muscle spasm, and pain. The doctor gave it as his opinion that claimant had suffered a 25% permanent partial disability to his back.

Dr. Hampton found the same symptoms present at the times he examined claimant, and testified that "a reasonable estimate of his disability should be rated at 15% loss at the level of the sacral and lumbar vertebrae."

■ It is possible to suffer a permanent partial disability to the body as a whole as the result of back injury, even though no bones are fractured. Worley v. Swift & Co., Mo.App., 231 S.W.2d 828. · Recovery may also be had under Section 287.190 RSMo 1940, V.A.M.S., for permanent partial disability, notwithstanding the fact that the person injured suffers no loss of time from work and no immediate loss of earning power. Betz v. Columbia Tel. Co., 224 Mo.App. 1004, 24 S.W.2d 224; Worley v. Swift & Co., Mo.App., 231 S.W.2d 828; Carr v. John W. Rowan Plastering Co., 227 Mo.App. 562, 55 S.W.2d 727; Sleets v. St. Louis Material & Supply Co., Mo.App., 39 S.W.2d 821; Graf v. National Steel Products Co., 225 Mo.App. 702, 38 S.W.2d 518; Lynch v. Gleaner Combine Harvester Corp., 223 Mo.App. 196, 17 S.W.2d 554.

■ Of course, the fact that the employee resumed his work may be considered for its evidentiary value in determining the ultimate fact issue, and in fixing the percentage of disability, if any; but the mere fact that such work is resumed, and at the same wage, does not disentitle the employee to compensation if, in fact, it appears from a consideration of the whole record that there is an injury which is the cause of a partial loss of bodily function which impairs the efficiency of the person in the ordinary pursuits of life. Betz v. Columbia Tel. Co., 224 Mo.App. 1004, 24 S.W.2d 224.

■ In our opinion, there was ample evidence in the record from which the commission could reasonably have found that claimant suffered a 20% disability to his body as a whole as a result of the accident of December 20, 1951.

■ It is urged that since the commission in its finding of fact found that claimant sustained an injury to the left leg as well as to the back, the award was based upon an injury for which no claim was made and for that reason the award should not be permitted to stand.

The evidence was conclusive that the claimant sustained a superficial abrasion to his leg, and that he abandoned any claim for compensation by reason of said injury. There was no suggestion in the evidence that said injury contributed in any degree to the disability, and to infer that the commission based its award in part on this slight leg injury would be clearly unreasonable and contrary to the rule that all reasonable intendments should be indulged in favor of the award of the commission. The case was tried before the commission on the theory that it was the back injury which caused the disability, and that the leg injury was of no consequence. Under the circumstances, we hold that the award was responsive to the evidence and the theory on which the case was tried.

■ It is further urged by appellant that the commission should have deducted from the 20% disability found to exist, the 10% rating for flat feet previously allowed claimant by the Veterans' Administration. Appellant, in support of this contention, cites Section 287.220 RSMo 1949, V.A.M.S.; and Goebel v. Missouri Candy Co., 227 Mo.App. 112, 50 S.W.2d 741. This defense was not set up in appellant's answer, nor does it appear that the matter was specifically urged below, and no reference to such defense was made in the motion for new trial filed in the trial court. But assuming, without deciding, that the question is before us, we are of the opinion that there is no merit to the contention made. The record does not disclose the basis of

the award of the Veterans' Administration. Whether it was for disability for industrial purposes or otherwise does not appear. Furthermore, it is not shown that the present impairment of claimant's body as a whole was contributed to in any degree by his flat feet. If the award of the Veterans' Administration could be said to be based upon a finding that claimant suffered a 10% disability to his body as a whole by reason of flat feet, the Industrial Commission, in the case at bar, was in no sense bound by such action. The finding of the Veterans' Administration would, at most, be merely evidence in support of a defense, if one were asserted by the employer and insurer, that the employee was in fact subject to a disability of ten per cent prior to the time of the accident out of which this proceeding has arisen. The refusal of the commission, in the case at bar, to be bound by the action of the Veterans' Administration does not, in view of the other evidence adduced, render the award erroneous as not being supported by competent evidence upon the whole record.

Finally, it is urged that the commission erred in failing to give credit to the employer for wages paid the employee after his injury. Appellant relies upon Section 287.160(3) RSMo 1949, V.A.M.S., which provides that: "The employer shall be entitled to credit for wages paid the employee after the injury, and for any sum paid to or for the employee or his dependents on account of the injury except for liability under section 287.140." The latter section deals with medical, surgical and hospital treatments.

Section 287.190 RSMo 1949, V.A.M.S. deals with injuries which leave an employee permanently maimed and which are likely to permanently impair his ability to carry on the ordinary pursuits of life, and which reduce his future occupational opportunities. Said section does not require a showing of loss of earning power as a prerequisite to the recovery of compensation payments. To hold the employer entitled to credit for wages earned would be inconsistent with the apparent purpose of the Act.

In our opinion, it was not error for the Commission to refuse to credit the employer with payment of wages made to the employee for services performed subsequent to the date of injury. These payments were not made on account of the injury and were not intended as gratuities, but represented money earned by the employee.

Finding no error in the record, it follows that the judgment of the circuit court affirming the award of the commission should in turn be affirmed by this court, and it is so ordered.

BENNICK, J., and ADAMS, Special Judge, concur.