Willie V. TEEL, Employee (Claimant), Appellant,

v.

F. BURKART MANUFACTURING COMPANY, Employer, and Michigan Mutual Liability Company, Insurer (Defendants), Respondents.

No. 28726.

St. Louis Court of Appeals.

Missouri.

Sept. 21, 1954.

260

Thomas L. Sullivan, St. Louis, for appellant.

Evans & Dixon, John R. Dixon, St. Louis, for respondents.

ANDERSON, Presiding Judge.

This case arose under the Missouri Workmen's Compensation Act, Section 287.010 et seq. RSMo 1949, V.A.M.S., and is an appeal by an employee from a judgment of the Circuit Court of the City of St. Louis affirming an award of the Industrial Commission. The Commission found claimant to have a 35% permanent partial disability of the man as a whole, and issued its award accordingly.

It was stipulated at the hearing before the referee that on October 27, 1949, claimant sustained an injury by accident which arose out of and in the course of his employment. The injury was to claimant's back and resulted from a fall. The nature and extent of the injury and disability was the sole issue tried.

After the accident claimant continued to work on and off until February 16, 1950. He was first treated by the employer's physician, Dr. A. H. Diehr, for a period of nine months, or until July of 1950. On August 7, 1950, claimant consulted Dr. H. R. McCarroll who placed him in Barnes Hospital for observation and tests. Thereafter, on August 28, 1950, claimant underwent an operation for the repair of a herniated disc. In describing this operation Dr. McCarroll testified:

"The 4th and 5th lumbosacral interspaces were explored through the right side. At the lumbosacral interspace a moderate protrusion of the intervertebral disc was found. On opening the posterior longitudinal ligament many moderate sized degenerative fragments were encountered and removed. In addition to this, there was an extreme enlargement of the first sacral nerve root at this point, which was thought to represent a primary neuroma. In view of these very definite findings the first sacral nerve root was excised * * *. The 4th lumbar interspace was then explored but no abnormality was found at this point. His wound was closed in the usual manner."

After the operation claimant remained under the care of Dr. McCarroll until March 7, 1951.

Claimant testified that he had never before suffered an injury to his back, and had never had lumbago or pain in that region of his back. He stated that at the present time he suffered from stiffness in the back,

and pain and loss of sensation in the lower portion of his right leg and foot. He also stated: "I can hardly bend my ankle. * * If I am walking on level ground I can make it pretty well, but if I have to go up an incline I have to turn my foot sideways to walk. I cannot hardly raise my toes. * * I am not able to raise them one-half inch either way." He further testified that he could not twist his toes sideways, or turn his foot in and out; that he had pain in the calf of his leg, which he described as a "pull" when his foot was forced up and down in going up a ramp or incline; that he did "very well" on level ground; that he had stiffness in the knee; that though he could bend the knee some, he could not "straighten it out"; that he could not bend it more than 33 degrees. Claimant further testified:

"* * * When I start out to walk, if I walk very fast then I play out in my hip. It just gives way. I cannot pull myself along hardly.

"Q. Can you bring your thigh up towards your body now as much as you did before you had this accident? A. No, sir.

"Q. Are you able to throw your leg out to the side with a hip motion as much now as you did before you had this accident? A. Not the right leg, no.

"Q. Can you cross your right leg over the left one as far as you could before the accident? A. No, sir.

* * * * * *

"Q. Are you able to tie your shoe laces? A. I can tie the left but I cannot get down and tie the right one. I have a little stool at home that I use, and my wife sometimes ties them."

On cross-examination claimant testified that at the present time he experienced no pain in his back.

Claimant was 55 years old; 5 feet 7 inches in height; and at the time of the hearing weighed 208 pounds.

Claimant further testified that he had been unemployed since being discharged from the hospital, though he had applied for work at several places. When seeking employment he would inform the person to whom he applied for work that he had a claim pending before the Division of Workmen's Compensation for a back injury. He stated: "When I went to these places looking for work they said they would not have a fellow in my shape. They asked me the questions about what kind of job I could do; they said they did not have anything if I could not do heavy lifting which I refused because the doctor told me not to." In the years prior to the hearing claimant had worked as a rigger, automobile mechanic, drill press operator, machine operator, and bench worker. Just prior to working for respondent F. Burkhart Manufacturing Company claimant had been employed as a night watchman.

In December, 1950, Dr. McCarroll told claimant that he could engage in light work; and on March 7, 1951, the doctor released him and told him he should go back to work.

Dr. Samson Wennerman examined claimant on December 23, 1949. On that occasion he found tenderness along the entire lumbar spine, with the greatest tenderness over the lumbo-1 sacral joint. The movements of the back were greatly limited. On bending forward claimant lacked more than 2½ feet of touching the floor. Backward and lateral bending was painful and limited. Straight leg raising, especially on the right, was painful. The X-ray examination at that time revealed extensive hypertrophic arthritis, involving all the lumbar vertebrae.

The doctor next examined claimant on December 7, 1950. He stated that on that occasion he found some tenderness at the lower part of the operative scar in claimant's back. On forward bending claimant could only flex the spine about 30 degrees. Backward and lateral bending was somewhat impaired but not as much as forward bending. There was some swelling of the right lower leg, and limitation of motion in the ankle. The lower part of the right leg felt cold. The witness further testified:

"I last examined him on May 22nd, 1951. At that time * * * his operative scar had healed. There was some tenderness about the scar. The movements of the back in all directions were markedly limited, and they were practically negligible. His straight leg raising was markedly limited on the right side * * * the movements of the right hip were impaired and flexion was limited to about a right angle. The movements of the right knee were also limited to a right angle. Rotation was practically absent. * * * Movements of the right ankle markedly impaired. The right lower extremity was cooler than the left, and sensation in the foot was gone. * * * I thought he had about 50 per cent loss of motion of the right ankle. * * * I would estimate his loss of the right knee to be about 15 to 20 per cent. * * * I stated that the movements of the hip are impaired. I would estimate that loss at about 20 per cent of the right hip. * * * Movements of the back in all directions are markedly limited, they are practically negligible. He can move very slightly but the movements are of no consequence. * * * It involves the entire lumbar spine where motion of the back exists. * * * He still had numbness of the right foot and somewhat of the right calf, with pain in the calf of the leg. The pain in the back was improved.

\*      \*      \*      \*      \*      \*

"Q.  Doctor, what part does the excising of the root of the S 1 nerve in Mr. Teel play in this disability you have described?  A.  It accounts for his loss of sensation, the weakness and loss of use, and partially, at least, of the foot and ankle.

\*      \*      \*      \*      \*      \*

"Q.  Doctor, do you have an opinion as to how much Mr. Teel is disabled as a whole man as a result of this disability in the right leg and back which you have decribed here?  A.  My opinion is that this man is permanently disabled about 70 per cent. * * * I

see no reason why he should get any better. There may be some worsening of this condition very gradually, but that is purely speculative."

Dr. Cyril W. Schumacher examined claimant a few days prior to the trial. He testified:

"On examining Mr. Teel I found that his right ankle is 80 per cent immobilized or disabled. * * * His right leg, the right lower extremity, the hip, the thigh, the leg and foot are cold and clammy. There is far less degree of temperature than the left, meaning to me that he has sensory nerve disturbance of the entire right lower extremity. When in the supine position I got 20 per cent motion of his foot. And when he attempts to put his sock on his foot he must kneel, and in the process of kneeling he is very uncertain. He must support the knee and he must support himself, meaning to me he has no motor sensation in his right extremity. That he has no coordination. I think he has about a 20 per cent disability of the hip and 10 per cent of the knee. In making an effort to determine the disability to his knee I feel it is primarily due to his back * * * I feel that the man has at least 60 per cent disability. That is for forward, backward and side motions. * * * I find there is sensory nerve disturbance; that is, the feeling to pinprick is far less on the right side than it is on the left, in his hip, buttocks, thigh, leg and foot. * * * That would be due to damage to the lumbo sacral trunk that comes off the spinal cord at the lumbar 5 and sacral one."

The witness gave it as his opinion that the limitation in claimant's back was caused by the operation, and that the disability of the foot, ankle and knee resulted from damage to the motor or sensory nerves. When asked the percentage of disability of the man as a whole, the witness replied: "I would say he was completely disabled. * * * I feel that he is unable to work."

Dr. John P. Murphy examined claimant on May 22, 1950. He testified that on that occasion the patient walked with a limp and complained of tenderness on palpation throughout the lumbar spine and particularly in the lumbosacral area. There was no muscle spasm in the lumber spine, but the patient jerkily flexed to about 25 to 30 degrees, and said that was as far as he could go because of back pain. Side bending to either side was carried out hesitantly for the same reason. On the left side, straight leg raising was restricted 15 to 20 degrees, with the same complaint, and straight leg raising on the right was restricted to 40 degrees with complaint of back pain. He had diminished sensation over the right lower leg, outer aspect.

Dr. Murphy saw claimant again on May 14, 1951. At that time, according to the doctor's testimony, "he complained of stiffness, numbness from the calf to the foot on the right side. He stated that the operation had helped his back but he also complained that his back kind of 'burns once in a while.' He complained he could not stoop very much because of a pull on his low back. * * * He walked with a right-sided limp, he had diminished sensation and a diminished Achilles reflex on the right. The foot lacked a few degrees of dorsi-flexion and a few degrees of plantar flexion. He complained of difficulty in walking up an incline. Flexion of the spine was restricted to about 50 degrees, with a complaint of pulling in both legs. Side bending to either side was within normal limits, but it was accompanied by a complaint of low back pain. No muscle spasm and no definite areas of tenderness. Hyperextension was restricted to a neutral position with a complaint of soreness of the low back. I concluded then that this patient still manifests some symptons of hypertrophic arthritis and the usual residual pathology following a laminectomy. In my opinion there were types of work that he could do."

The doctor further testified that he found no evidence of muscle atrophy or evidence that claimant's right lower limb was cold and clammy. He found no listing of the back or shortening of the limbs. There was no loss of motion in the hip. He stated:

"The patient when I saw him a year previously restricted flexion 25 to 30 degrees and when I saw him this year it was fifty degrees. For a man like this, that is fairly normal.

* * * * * *

"If you excise a neuroma there should be some diminution of sensation along the distribution of that nerve. If there is a complete cutting of the nerve there should be some diminution of sensation and hyper-flexion."

The witness further stated that the excising of nerve root 1 should not affect the right lower leg other than to produce a slight weakness for a while. He was of the opinion that claimant had probably 5 per cent loss of use at the ankle, and that continued work would certainly improve the use of the leg and foot. He stated there was no loss of motion in the knee or hips.

Dr. Murphy gave it as his opinion that claimant suffered a 25 per cent permanent partial disability of the man as a whole, taking into consideration claimant's complaints, the hospital records, and the clinical and physical findings at his last examination of claimant.

Dr. H. R. McCarroll testified for the respondents. He first examined claimant on August 7, 1950. The doctor testified:

"Examination revealed a heavily built man who stood with the right knee flexed and the right heel elevated. When the * * * right foot was approximated to the floor he showed a slight list of his back to the right, with severe muscle spasm in the lumbar spine, more marked on the right side. There was tenderness over the 4th and 5th lumbar interspaces and over the muscle mass to the right of these segments. * * * Motions of the back remained satisfactory in all directions but he complained of pain on each. In the lower extremity there was no shortening and straight leg raising was nor-

mal on the left but on the right side * * * limited to 45 degrees at which point he complained of pain, which was increased on forced dorsiflexion of the right foot and relieved on flexion of the knee. The right ankle jerk was weaker than the left, but the knee jerks were equal on the two sides. Sensory examination revealed diminished sensation to pinprick throughout the right lower extremity more marked on the lateral aspect. * * * X-rays of the lumbosacral area, the lower part of the lumbar spine, revealed marked degree of hypertrophic arthritis, with a marked narrowing of the lumbosacral interspace. * * * I thought we were dealing with a ruptured intervertebral disc, at either the 4th or 5th lumbar interspace, but probably the fifth."

Claimant was admitted to Barnes Hospital, on August 21, 1950, and, after myelogram studies, was operated on by Dr. McCarroll on August 28, 1950. A moderate protrusion of the intervertebral disc was found on the right side, which was removed. At the same time the nerve root heretofore mentioned was excised. Claimant made a satisfactory recovery from the operation and was discharged from the hospital on September 17, 1950.

Claimant was next seen by Dr. McCarroll on October 16, 1950. The patient at that time stated that the extreme pain he originally experienced had markedly improved. He had no pain in the back, but still complained of some tingling sensation in the right foot. He had a very satisfactory range of motion, but there was still a little limitation at the time.

Dr. McCarroll again examined claimant on November 10, 1950. At that time claimant stated that he did not have the original back pain for which the surgery was performed, but did have some discomfort in his right leg. There was some tenderness over the 4th and 5th lumbar interspaces, and some limitation of motion. There was no list to either side, and no muscle spasm. There was no pain or limitation of motion on straight leg raising. There was some swelling and edema about the right foot, ankle, and lower half of the right leg, with diminished sensation to pinprick over this same area. The doctor at this time advised claimant to return to light work.

The doctor next examined claimant on December 1, 1950. At that time there was no list or muscle spasm. There was some tenderness to pressure over the lumbosacral region and limitation of motion, and pain in the back. Straight leg raising was possible to 90 degrees on both sides, which the doctor said was a normal range of motion for a man of claimant's age. Hip motions were satisfactory. There was a diminished sensation to pinprick throughout the right lower extremity upward to the junction of the upper and middle one-third of the thigh, the greatest loss being throughout the outer border of the lower leg and thigh. Dr. McCarroll stated that at that time he thought claimant was still showing satisfactory progress and that he advised claimant to increase his activities.

Dr. McCarroll's next examination was on March 7, 1951. He stated that the examination—

"revealed no list of his back to either side. There was some slight increase in muscle tone of the lumbar region but there was no true fixed muscle spasm. * * * There was a diffuse tenderness to pressure throughout the lumbosacral area over operative scar. The motions of the back were mildly limited, but there was no complaint of any discomfort. During all this time the motions of his back had gradually improved * * * as one would expect with surgery of this type. Straight leg raising was possible to 90 degrees without evidence of pain on either side. * * * Sensory examination still revealed diminished sensation to pinprick involving the entire right lower extremity, extending upwardly and anteriorly to the junction of the upper and middle one-third and posteriorly to the junction of the middle and lower thirds. There was no definite anatomi-

cal pattern in the sensory changes at that time. * * * I thought that it was possible for him to do light work and I told him that at the time of his last two or three examinations. * * * He told me a time or two on examination that he had a feeling that his foot was frost bitten and he said it was tingling. The circulation was apparently satisfactory, and the temperature essentially the same on the two sides. * * * There was no shortening of the extremities. They were equal in length and the list of his back had entirely disappeared. In fact, it was never present after the operation at the times when I saw him.

"Q. * * * did you find any loss of motion at this man's hip? A. No, sir. As I said, straight leg raising was possible to 90 degrees on each side. * * * Certainly that is normal, I would consider that normal for a man of his age and build.

"Q. Did you find any evidence of loss of motion at all? A. No. The motions of his ankle, his foot and knee remained satisfactory; certainly there was clinically no evidence * * * there was some limitation in the back after the operation. What you might expect from an operation of this type. It improved from the first examination and at the time when I last saw him there was a mild degree of limitation which was impossible to estimate in the number of degrees. Certainly, it was very, very little, and not of any great significance at all."

The doctor was of the opinion that the excision of the first sacral root on the right side was of no great significance though it might have had something to do with the loss of sensation in the right lower extremity. He stated that there had been some improvement in regard to sensation. Dr. McCarroll further testified:

"At the time of my last examination, and taking into consideration my find-ings then, I think that this man did have some permanent residual disability. Based on his findings at that time, I estimated it at 25 per cent of the individual as a whole."

The referee made an award finding that claimant had suffered a 40% permanent partial disability to the man as a whole. Applications for review by the Industrial Commission were filed by the claimant and by the employer and its insurer. The parties also requested oral argument. Claimant thereafter requested the Industrial Commission to appoint a qualified impartial medical examiner to examine him, and further requested permission to introduce further medical evidence. The Commission denied the employee's request for permission to introduce further medical evidence, but granted the request for the appointment of an impartial medical examiner. The Commission appointed Dr. Charles W. Miller to make the examination.

Dr. Miller made his examination and copies of his report, findings and opinion were sent to both parties by the Industrial Commission, and the parties were notified that either one could call the doctor for cross-examination if they so desired. Counsel for claimant then notified the Commission that he wanted to examine Dr. Miller. The cause was then set for hearing before the Commission for that purpose. At the hearing the report of Dr. Miller was introduced and Dr. Miller was called as a witness and examined.

The report of Dr. Miller sets out claimant's history, chief complaints, and considerable other data not material to our present inquiry. Those portions bearing on the issue before us are to be found in that part of his report dealing with claimant's complaints at the time of his physical examination and the doctor's report of his findings. The report states:

"He complains of numbness in the right lower extremity, cramping sensation in the right lower extremity, inability to flex and extend his foot and ankle, and pain in the region of the

right sacroiliac joint and pain on climbing stairs or an incline in the right toes. * * *

"He does not appear to be in any acute pain at this time. * * * He walks with a limp referable to his right lower extremity. * * * There are no marked group muscle atrophies or group muscle weaknesses noted on inspection. He has a scar in the midline of the back, beginning about lumbar 2 or 3 and extending downward over the back to about the sacroiliac joint. * * * When requested to lean over and touch the floor the only part of his back he moves is his neck perhaps a little bit of the upper part, that is the dorsal area. In attempting to assume the squatting position he does so by bending his left knee and extending his right knee laterally. * * *

"Back and Spine: good alignment and good position is noted. He performs the usual range of back movements. When asked to lean forward he does so only slightly and hyperextension of the back is done only slightly. He indicates the painful area in the back as a pulling sensation beginning along the right margin of the scar and over the scar and downward and outward posteriorly over the right hip joint. There is no muscle atrophy. He does wear a canvas support in which is incorporated some steel or metallic bars.

* * * * * *

"Extremities: * * * The right lower extremity can be completely flexed at the knee. An attempt to flex the thigh on the abdomen produces pain in the region of the right sacroiliac joint. The thigh is not bothered so much, very little if any. The leg can be elevated about 24 inches from the table before the pain comes.' Extension of the knee is normal. Flexion is limited about 85%. There is marked limitation of all movements of the ankle, that is flexion and exten-

sion, internal rotation and external rotation. Straight leg test can be carried out normally on the left. Flexion of the thigh on the abdomen forcibly on the left does not cause pain.

* * * * * *

"Measurements: The left calf measures 15⅛ inches. The left mid-thigh measures 20 inches. The right calf measures 15 inches. The right mid-thigh measures 19½ inches. * * *

"Sensory test: Sharp and dull sensation is absent on the right leg from an area about four inches below the knee covering the entire circumference of the leg. Cotton-Wool sensation was diminished over the same areas as the sharp and dull. Hot and cold somewhat diminished, especially hot. Cold was recognized in certain areas.

"Movements: There is no foot drop, ankle drop or toe drop. Movements of the toes can be carried out, the range is not normal. Position sense is diminished on the right involving the toes. Vibratory sense on the right is diminished in an area for a distance of about eight inches above the ankle.

* * * * * *

"X-ray Report: * * * AP and lateral views of the lumbar spine, including both hip joints and both sacroiliac joints; the hip joints and the sacroiliac joints, both right and left, appear normal. There are moderate hypertrophic changes noted in all the lumbar vertebrae. Some evidence of a radio-opaque material is noted in the area from lumbar five to sacral one in the spinal canal. There is thought to be some narrowing of the intervertebral space between the last lumbar and the first sacral vertebrae.

"A lateral spot film reveals some rather marked hypertrophic changes in lumbar five and sacral one.

"AP view of the right hip is negative.

"AP and lateral view of the right knee is negative.

"AP and lateral view of the right ankle is negative.

*"Conclusions:* From the operating room hospital record it was noted that Willie Teel underwent surgery for herniated nucleus pulposus involving the distance between lumbar five and sacral one. The disc was removed together with and excision of a neuroma of sacral one root.

"The chief findings noted in our examination were referable to his right lower extremity. He walks with a limp. He does not move his right hip, right knee or right ankle or right foot in a normal manner at this time. Subjectively it was noted that he had a stocking type of anesthesia in the right lower extremity from about four inches below the knee downward over the entire foot, leg and ankle. This cannot be explained on any organic basis. It is my opinion that his complaints are for the most part functional, especially the anesthesia.

"Since he did undergo a disc operation it appears to me that his partial permanent disability should be considered about 35% of a man as a whole. It is my opinion that the results from surgery in his case have been excellent and that there should be no further increase in the disability. It is my opinion that there will be a marked reduction in the disability from his present level. However, in any event, I would feel that we should consider him partially and permanently disabled in the range of about 35%."

Dr. Miller testified that the anesthesia mentioned in his report was both organic and functional. It would appear from his testimony that his opinion in this respect was based on the fact that the nerve supply of some of the area affected came from sources other than a sacral one. As to the hypoesthesia, the doctor stated: "I do not know that it is disabling." He further stated that he found no evidence that claimant's foot was cold and clammy.

In explaining the notation in his report that flexion in the knee was limited to 85%, the doctor stated that he meant there was a loss of 15% on flexion. He also testified that there was a 20% limitation of movement of the right ankle, and about 15% at the hip. He stated that the right knee was functionally good but thought he had a 15% limitation of flexion in it. The doctor further testified:

"Q. Doctor, will you tell us what you found as to the movement of his back? A. Well, when he was asked to carry them out he did not do so in a normal manner. I watched him stand, and he stood, I think, normally. That is, he did not list to either side. There was no tilting of the pelvis and no obliteration of the lumbar curve—it is normal. The movements he carried out in his back were, for the most part, of his neck. They were, I think, pretty close to normal. And of his thoracic vertebrae. In the lumbar area what he did do was not normal. Because when I asked him to squat down he did so on his good leg and extended the bad one out. * * * When he was on the table I would get hold of him and manipulate him and I thought that the lumbar muscles had a pretty good range of motion for a man of his age."

On manipulation, the doctor got claimant to bend to a position which the doctor considered almost normal for a man of claimant's age. The doctor then stated that it would be difficult to say if claimant could voluntarily bend to such position, but thought he could voluntarily bend further than he did at the time. He stated that claimant walked with a limp, and that the Achilles reflex in the lower right ankle was entirely absent; that there was not too much significance to be attached to the difference in measurements of the right calf and right thigh as compared with those on the left; that the amount of arthritis shown in the X-rays was about what you would expect to find in an average workman the age of claimant; that the hypertrophic changes were more marked around the first sacral vertebra and the fifth lumbar verte-

bra, which condition was partially caused at least by the condition which caused the operation; that he doubted the arthritic condition would continue to progress or get worse; that there was no evidence of fusion of the first sacrum and the fifth lumbar; that the disc at that point was not gone, but the nucleus pulposus portion of it had disappeared; that there was usually some motion in the joint between the first sacrum and the fifth lumbar, but not a great deal, and that he doubted if the removal of a nucleus pulposus would reduce the motion.

In the doctor's opinion there should be further improvement in claimant's condition, but that in arriving at his opinion of 35% disability of the man as a whole, he did not take into consideration this possibility of further improvement.

Appellant went to work at the Chevrolet plant in St. Louis in August, 1951, and was working regularly at the time Dr. Miller examined him in May, 1952.

Following this further hearing, the Industrial Commission found that claimant was permanently and partially disabled to the extent of 35% of the man as a whole, and made its award accordingly. The Circuit Court affirmed, and claimant appealed to this court.

Appellant's first point is that the Commission employed the wrong method in establishing the compensable period.

The Commission found claimant's disability to be 35% of the man as a whole, and fixed the compensable period at 35% of 400 weeks. Appellant argues that under Section 287.190 RSMo 1949, V.A.M.S., said period should be determined with regard to the ratings for specific disabilities as set out in said section.

A like contention was made by the appellant in Chapman v. Raftery, Mo.App., 174 S.W.2d 352, a case strikingly similar on its facts to the case at bar, where the Commission employed the same method in fixing the compensable period as it did in the instant case. We held that the method employed by the Commission in that case was proper. We are still of that view. There is no merit to the point urged.

It is next urged that the finding of the Commission is unreasonable and not supported by competent and substantial evidence.

In determining the issue thus presented, we are not at liberty to substitute our own judgment for that of the Industrial Commission, but must determine whether the Commission could have reasonably made its findings and reached its result upon consideration of all the evidence before it, and will set aside the decision only if it is contrary to the overwhelming weight of the evidence. Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55. It is also our duty to view the record in the light most favorable to the findings and award. Thacker v. Massman Const. Co., Mo.Sup., 247 S.W.2d 623.

It must also be borne in mind that a finding of the Commission based upon the acceptance by it of one of two conflicting medical theories will not be disturbed unless it can be said that the evidence supporting said theory was not substantial or that the finding based thereon was against the overwhelming weight of the evidence. Sams v. Hayes Adhesive Co., Mo.App., 260 S.W.2d 815. In this last mentioned case we said, 260 S.W.2d loc. cit. 819:

"It is true that claimant presented testimony which, had it been accepted by the Commission, would have supported an award in claimant's favor. But the Commission was not compelled to believe this testimony. The Commission was at liberty to reject all or any part of the testimony which it did not consider credible, and accept as true contrary evidence adduced by the respondents. The Commission also had the right to accept parts of the testimony of the physician testifying for claimant, and the physician who testi-

fied for respondents, it being the province of the Commission to resolve conflicts in the evidence and give probative value to only that part which has the ring of truth in it."

■ With the foregoing rules in mind, we have examined the record in this case and have come to the conclusion that there is substantial evidence in the record to support the award of the Commission and that its findings were not against the overwhelming weight of the evidence.

Finding no error in the record, it follows that the judgment of the circuit court affirming the award of the Commission should in turn be affirmed by this court, and it is so ordered.

BENNICK, J., and NOAH WEINSTEIN, Special Judge, concur.