**Allen E. LOFTON, Respondent,**

v.

**ARMOUR & COMPANY, Appellant.**

No. 22724.

Kansas City Court of Appeals.

Missouri.

Feb. 3, 1958.

Brown, Douglas & Brown, R. A. Brown, St. Joseph, for appellant.

Randolph & Randolph, St. Joseph, by Lewis F. Randolph, Jr., St. Joseph, for respondent.

CAVE, Judge.

This is a workmen's compensation case. It is an appeal by the employer, Armour & Company, from a judgment of the Circuit Court of Buchanan County, affirming the award of the Industrial Commission in favor of the employee, in the amount of $1,640.68.

The sole question raised on appeal is whether the accident did or did not cause an injury to employee's back for which an award could be made. It is conceded that there was substantial evidence to support all other essential findings. The appellant strenuously argues that there is no substantial competent evidence to support the finding of the referee, the commission, and the court, that the respondent suffered an injury as a result of the accident.

We shall refer to the respondent as the "employee"; the appellant as the "employer"; and the Industrial Commission as the "commission".

The accident occurred on February 19, 1953. The employee was working in the sheep shearing department of the employer, and his duties required him to fill large bags with the fleece of the sheep. These bags were about seven and a half feet long, about three feet in diameter, and weighed 250–300 pounds. He was in the act of standing one of these bags "on end" when his feet slipped, and he fell to the floor in a "twisted" position, and the bag fell across his body. He immediately experienced severe pain in the stomach, and later a "knife like pain in the back"; it "run down, almost to the calf of my leg"; he spent a sleepless night after the accident "and was hardly able to get around the next day"; he was given heat treatments by the company doctor, which gave him some temporary relief; and after a few days he was hospitalized for about three weeks. After the accident, he was nauseated and vomited several times a day.

He went back to work the next day, but merely assisted in feeding the livestock, "and my back started to hurting awful". He did not go back to work for Armour & Company thereafter, but eighteen weeks later he secured employment with the City of St. Joseph, doing light work which did not require lifting or much bending. He has complained of pain in the back, right leg, and stomach, since the time of the accident, and at the hearing of this cause in July, 1956, he was wearing a back support, at the direction of Dr. Unger.

On the issue of whether the employee suffered an injury, there was considerable medical testimony, and we will consider the evidence of the various doctors in the order in which they examined the employee. Four doctors were called as witnesses by the employer, and one by the employee.

Dr. Fisher, who specializes in radiology, testified that he took several X-rays of employee's back on February 25, 1953,— six days after the accident—and stated that the X-rays did not show any traumatic injury of any kind to the back; that there was no compression fracture at the 12th dorsal vertebra; however, there was a "wedging" of this vertebra, that is, thicker on the "back side" than on the "front edge"; that "several things might cause that slight wedging;" that there was a slight spur at the 12th dorsal, which "means a little deposit of calcium which is contiguous with the vertebral body itself, and extends into the soft tissues about the margins of the bone"; but that this spur could not have been caused by an accident occurring six days earlier. He also stated that his X-rays did not disclose any "possible fracture" of the transverse process at the 4th lumbar vertebra. It might be well at this point to mention a bit of testimony given by Dr. Boeshart, employer's witness, of the Veterans' Hospital at Wadsworth, Kansas, where the employee was examined and

X-rayed on April 5, 1954. The report of that examination states, among other things, that "X-rays of the back showed possible fracture, old or new—tip of the transverse process of L 4 vertebra", meaning the fourth lumbar.

The next doctor to examine the employee and who testified was Dr. Kulowski, an orthopedic surgeon of St. Joseph, Missouri. His examination was made April 13, 1953. The "clinical diagnosis was mild strain and I didn't suggest any treatment, I didn't think it was indicated. Q. From your examination, did he have any permanent disability of any kind or character? A. From the one examination, I would say no". He was shown the X-rays taken by Dr. Fisher on February 25th, and stated: "I don't see anything in these films that look like an acute injury to me". He did notice that there was "a mild wedge-formed deformity" of the 12th dorsal. He was asked:

"Q. What do you think that condition is, at the 12th dorsal? A. All I can say from the evidence here, is that we have a slight compression deformity, and what it's due to I don't know, frankly I don't.

"Q. And had that resulted from the alleged accident of February 19, 1953, what would you have found that would be different, or what would you expect to find? A. Well, I would expect to find a break in the continuity, frankly—in front of the vertebra, that is what I go by mostly. A break in the continuity in front of the vertebra. I don't see it here. * * * I would just say its an old deformity—a mild deformity, * * * how old I don't know.

"Q. Does that mean more than six days old? A. That's right".

On cross examination, he testified that from his examination of the various X-rays he also found a narrowing of the space between the 5th and 6th lumbar, and that there was a "possibility" of connection between that condition and the accident; that "it's a possibility, but not probable, from my interpretation".

He was then asked a hypothetical question, which also included facts requested by the attorney for the company. We will not quote the question, but it included the facts surrounding the accident, the complaints of the employee, the evidence of other doctors, and in its final form was not objected to by the employer. Based upon such assumed facts, the doctor testified that such an accident could cause the "wedging deformity" which he had described, and that the disability resulting therefrom "would be in the neighborhood of 5 to 10% at the most".

On the question of interpreting X-rays, the doctor stated that they do not always show all things that are present, "and it's possible also that some show things that aren't there—you know it's the interpretation of the individual".

Dr. Fisher also said it is possible to make mistakes in reading X-rays.

Dr. Buck also examined the employee on April 13, 1953; and testified that the employee complained of pain across the abdomen and lower back, sometimes worse on the right side; pains in the chest and right arm; that he vomited every day and sometimes two or three times a day; and occasionally had pain across the right thigh. Dr. Buck's examination was primarily limited to the back. He made no X-rays, but examined some made by others. It was his opinion that the employee had not suffered an injury to the back as a result of the accident.

We now return to the testimony of Dr. Boeshart, who is chief surgeon at the Veterans' Hospital. The employee went to the hospital on April 6, 1954. He complained of back pains and abdominal pains, nausea, and vomiting. Many X-rays were taken and the material part of the report is as stated supra: "X-rays of the back showed possible fracture, old or new—tip of the transverse process of L 4 Vertebra". He was asked:

"Q. Now after all of the examinations had been made and after you had examined this fellow and you had treated him, in your opinion, did he have anything wrong with his back? A. We didn't feel—I hate to say that he did not have anything wrong with his back—but we thought it was of minimal significance —and we really almost ignored the back.

"Q. You did evaluate the back then? A. Yes.

"Q. Now what, in your opinion, was his trouble, what was causing his disability, if anything. A. Well, we thought it was all gastro intestinal—he had many symptoms relating to his gastro intestinal tract". On cross examination, the doctor stated that he was not competent to interpret X-rays, and did not do so.

Dr. Harold Unger, an orthopedic physician and surgeon of Kansas City, examined the employee on July 28, 1954. Dr. Unger is the only physician who was called as a witness by the employee. He recited the detailed history given him by employee and the examinations and tests he made in order to arrive at his diagnosis. He agrees with the other doctors to the extent that there is a "lumbarized" area in the lower part of the back at the sacrum, and that "this represents a congenital anomaly". He stated that he found a "definite wedging of the 12th dorsal vertebra, a so-called compression vertebra. * * * There is also a definite spur projecting from the anterior-superior portion of the 12th dorsal vertebra, * *. Also a definite narrowing or thinning of the discs between the 5th lumbar vertebra and the 6th lumbar vertebra".

After detailing his interpretation of his various X-rays, he was asked what his conclusions were with reference to the conditions he found, and stated: "It was my opinion, that the patient apparently had an injury as a result of a fall on February 15, 1953, with pain in the back radiating to the right side. * * * In

view of the slight compression deformity of the 12th dorsal vertebra, associated with a definite osteoarthritic spur, it is logical to conclude that he may have easily sustained a slight but definite compression fracture of the 12th dorsal vertebra. I might point out that such an injury is practically always associated with abdominal symptoms. In addition, the patient has congenital anomalies manifested by lumbarization of the 1st sacral segment with narrowing of the lower two discs. * * * This patient's back is definitely disabled because of the congenital anomalies of the lower back, which could have been easily aggravated. He is also disabled because of the slight compression deformity of the 12th dorsal vertebra, associated with slight but definite osteoarthritis. * * * I estimate that the residual disability as a result of injury was approximately twenty to twenty-five per cent (20% to 25%) of the body as a whole." The doctor prescribed a support for the back.

On cross examination he was asked:

"Q. You conclude that he may have easily sustained a slight but definite compression fracture? A. That is correct.

"Q. In other words, you do not say he did or he did not? A. That's correct.

"Q. The deformity may be congenital or it may not be? A. It may be congenital or it may be from some condition during the growing years, or it may be due to an injury, such as he sustained.

"Q. And you can't say what caused it? A. * * * the thing that I want to point out with reference to my conclusion, and I think I so indicated, that the arthritis is localized to the 12th dorsal, and as a rule, when there is such localization to one vertebra, in the absence of arthritis in the vertebra above and below, we usually believe that it's probably an injury. Now, if you were to show me a picture taken one or two or three days after the injury, and it would show the same arthritic spur, then I would say that that arthri-

tic spur was present prior to the injury. * * *

"Q. Now if you would assume that X-rays taken a few days afterward showed no such fracture, then you would have to admit that this was something that existed prior to the alleged accident, wouldn't you? A. I would like to know whether the X-rays taken a few days after the injury showed a wedged vertebra, and whether they showed an arthritic spur. * * * We sometimes see a wedged vertebra immediately after an injury, and we sometimes have a great deal of difficulty in trying to evaluate whether that wedged vertebra is due to the fracture or not, or whether it's old—we all have that experience, * * *.

"Q. Well, you have got some disability from the 12th dorsal, not very much? A. There is some disability from the 12th dorsal. * * *

"Q. And his entire disability, due to all of his back trouble, in your opinion, is twenty to twenty-five per cent? * * * A. * * * In this particular case, my conclusion is based at 20 to 25 per cent disability is referred to as a result of the injury, and does not include that degree of disability which existed prior to the injury from what any cause may have been there. * * * He has a deficient spine in my opinion to begin with. * * * That spine has been subjected to trauma. * * It is still my opinion that when that patient's spine was subjected to trauma that it was easily, permanently aggravated, and I so stated in my report. * * *

"Q. You're admitting—that if the lower part of the spine was damaged by this accident, it was an aggravation of a preexisting condition? A. That's correct. * * *

"Q. How much of the disability results from his lower back and how much from the dorsal? A. Well, in this particular case, I give him 20 to 25 per cent altogether, I would say that approximately at least 10 degrees of that is the result of the dorsal vertebra, the 12th dorsal, at least 10 degrees.

"Q. Degrees? A. No, 10 percentage point."

On redirect examination, the doctor was asked: "Q. If this man had no back complaints before the alleged injury— would you say that the condition that you find, and have described, is one that is an aggravation of the spine? A. Yes, sir."

 In reviewing this case, we have the duty of determining whether the commission's award is supported by competent and substantial evidence upon the whole record. Const. Art. V, Sec. 22, V.A. M.S. This does not mean that we may substitute our own judgment on the evidence for that of the commission. But we are authorized to decide whether the commission could have reasonably made its findings and reached its result, upon a consideration of all of the evidence before it, and to set aside its decision if clearly contrary to the overwhelming weight of the evidence. Culberson v. Daniel Hamm Drayage Co., Mo., 286 S. W.2d 813, 816.

The employer strenuously argues that there is no substantial and believable evidence to support the commission's finding. Certainly employer's witnesses, Drs. Fisher and Buck, are definite in their opinion that the employee suffered no injury to his back as a result of the accident.

Dr. Kulowski also expressed the opinion that the conditions he found did not result from the accident, but on cross-examination, he said that certain conditions found could possibly result from the accident; that assuming the facts propounded in the hypothetical question, the accident could cause the "wedging deformities" which he had found existed; and that the disability resulting therefrom "would be in the neighborhood of 5 to 10% at the most".

Dr. Boeshart, of the Veterans' Hospital, would not undertake to interpret the

X-rays, but did testify concerning the report made to him by others at the hospital. That report "showed possible fracture, old or new, tip of the transverse process of L4 vertebra. * * * We didn't feel, I hate to say that he didn't have anything wrong with his back—but we thought it was of minimal significance—and we really almost ignored the back". They thought the employee's disability related to his gastro intestinal tract.

Dr. Unger's testimony is set out somewhat in detail supra, and will not be repeated. However, he adhears to his opinion that the employee suffered an injury as a result of the accident.

All the doctors seem to agree that in the area of the sacrum, or lower back, the employee had a congenital condition. They also agree that there was a slight wedging of the 12th dorsal vertebra. They differ in their opinion of whether the accident injured the back. It is not within the province of the appellate court to weigh the evidence, or to decide a case on the basis of what our decision would have been had we heard the evidence in the first instance.

In determining whether there is substantial evidence to support the award, we cannot overlook the testimony of the employee, who stated that, prior to the time of the accident, he had been in good health; "I could do as much work as any man"; that he had not had a prior injury of any consequence; that he had not suffered pain in his back or legs, but that since the accident such pain had been constant; and that he could not do heavy lifting or work that required much stooping.

■ The employer argues that even if the accident aggravated the congenital condition of the lower back, nevertheless recovery may not be had because the claim filed was not for an aggravation of an existing condition. That portion of the claim reads: "Parts of body injured—back and probably internal". It

seems to us that if the employee had a congenital condition in the back, which had not theretofore impaired his health or working ability, but that the accident aggravated such condition, then he would be entitled to compensation for such impairment. Hammett v. Nooter Corporation, Mo.App., 264 S.W.2d 915.

Dr. Unger testified that the congenital condition in the lower back was "architecturally" imperfect, "but not to the patient's knowledge". Dr. Buck also stated that an employer would not refuse to employ a person because of a congenital back condition such as the employee had. In other words, the congenital condition would not impair the employee's ability to perform the work assigned him. In fact he had been doing so for more than three years; but, according to his testimony, after the accident he could not do so.

■ We are of the opinion that there is substantial evidence to support the finding that the employee suffered in injury as a result of the accident. However, the employer contends that there is no basis for the finding of 15% permanent partial disability of the body as a whole. Dr. Unger estimated the disability at 20 to 25%; and Dr. Kulowski, in answering the hypothetical question, estimated the disability "at 5 to 10% at the most". The finding that there was a disability of 15% was a finding of fact which was within the province of the commission. It was not conclusively bound by the percentage estimate of the doctors. It must consider the evidence as a whole in arriving at its conclusion, and if such finding is supported by substantial and competent evidence, a reviewing court is not authorized to interfere with it. Worley v. Swift & Co., Mo.App., 231 S.W.2d 828, 832, and cases there cited.

The employer severely criticizes the testimony of Dr. Unger in certain respects, and argues that it is unworthy of belief. One criticism is that Dr. Unger voluntarily stated that the doctors at the Wadsworth

hospital had not "evaluated" the employee's back. This statement related to Dr. Unger's interpretation of the written report of the Wadsworth hospital. Whether such statement was justified is of little importance in determining whether the employee was injured. But, it might be pointed out that Dr. Boeshart, chief surgeon of the hospital, testified, "* * * we really almost ignored his back". That could be a reasonable basis for an opinion that the back had not been fully "evaluated". However, we are unwilling to hold that the testimony of Dr. Unger is unworthy of belief.

The judgment should be affirmed. It is so ordered.

All concur.