Fred J. HOFFMEISTER, Chairman, William Kohn, John A. Arnold, Christian B. Peper, and Albert Krueger, constituting the Bar Committee of the Eighth Judicial Circuit of Missouri, Fred B. Hulse, James M. Reeves, Forrest M. Hemker, Clyde J. Linde and C. Wallace Walter, Members of the Advisory Committee of the Supreme Court, Informants,

v.

Edward M. TOD, Respondent.

No. 47787.

Supreme Court of Missouri,

In Banc.

Sept. 11, 1961.

6

Courtney S. Goodman, St. Louis, special counsel for informants.

Morris J. Levin, S. Sheldon Weinhaus, St. Louis, for respondent.

F. Trowbridge vom Baur, Washington, D. C., Wayland B. Cedarquist, Chicago, Ill., Jonathan F. Ells, Winsted, Conn., Terrell Marshall, Little Rock, Ark., William L. Murphey, Los Angeles, Cal., H. H. Perry, Jr., Albany, Ga., Raymond Reisler, Brooklyn, N. Y., Melvin F. Adler, Fort Worth, Tex., for American Bar Ass'n, amicus curiae.

Rexford H. Caruthers, Caruthers & Montrey, St. Louis, for Lawyer's Ass'n of St. Louis, amicus curiae.

James K. Moran, Charles F. Luke, St. Louis, for Bar Ass'n of St. Louis, amicus curiae.

Malcolm L. Bartley, St. Louis, for Missouri State Labor Council, AFL–CIO, amicus curiae.

William M. Howard, St. Louis, Joseph E. Stevens, Jr., Kansas City, for Unau-

thorized Practice of Law Committee of Missouri Bar Integrated, amicus curiae.

EAGER, Judge.

By leave of court, the Bar Committee of the Eighth (now Twenty-Second) Judicial Circuit filed here an information charging respondent Edward M. Tod, a layman, with the unauthorized practice of law in various particulars, and with contempt. The Committee had previously conducted hearings and found probable cause. Tod filed an answer and return. No point is made on these formal pleadings and we do not digest them, except to say that Tod has denied that any of his acts constituted the practice of law or contempt, and asserts that he has never held himself out as an attorney. The issues will clearly appear from our discussions of the evidence. The members of the Bar Advisory Committee have jointly entered their appearance, by leave, and have become additional parties informant. Leave has also been given for the filing of sundry briefs amici, which were duly filed; these include the St. Louis Lawyers and Bar Associations, the Missouri Bar (by its Committee on Unauthorized Practice), the American Bar Association, and the Missouri State Labor Council, AFL–CIO. These additional briefs have been helpful.

The court appointed the Honorable P.M. Marr as its Special Commissioner with the usual powers. He held extended hearings in St. Louis, including seven days of actual testimony, and he has filed a detailed report, with his findings and conclusions. For the present it will suffice to say that he found that Tod had been unlawfully practicing law and that he should be adjudged guilty of contempt; he recommended that Tod be enjoined from performing sundry acts which he had customarily been performing, and that he be fined.

Tod is charged, in considerable detail, with unlawful practice before the Divi-

sion of Workmen's Compensation and also before the Division of Employment Security, both being Divisions of the Department of Labor and Industrial Relations. It will be necessary to state the facts in some detail. There is no pretense that Tod has ever been licensed as a lawyer, anywhere; he is and has been since 1944, a labor representative. From 1944 to 1957 he was President of the St. Louis Industrial Union Council, and maintained an office as such in the Buder Building; he was designated by it as "Community Services Representative" to the United Fund, Inc. (the "War Fund" during appropriate years) of St. Louis. When the AFL and the CIO merged in 1957, Tod became Vice-President of the new St. Louis Labor Council AFL-CIO, and has remained as its "Community Services Representative." Since 1957 Tod's office in the Buder Building has been designated and listed as the *Union Referral Center,*" and the expense of its maintenance has been paid by various union locals. The national AFL-CIO has set up so-called Community Service Committees which have designated representatives in many principal cities. These local representatives, such as Tod, act as "liason" representatives between labor and the local charity organizations. As such representative, Tod's principal duties (and probably his sole duties) are to "sell the United Fund program" by visiting the various plants where his union members are employed, to consult with management and union officials, and to set up and promote programs of solicitation and wage deductions. His entire compensation of $8,280 per year is paid by the United Fund, obviously for the services just referred to. He receives nothing from the unions, national or local, except his office expenses. He also has an office at another location, maintained by the United Fund. He testified that his total services comprehend all "out-plant problems of all our union members," a sizable task at best, we may say. Apparently the "Community Services Committee" of

the AFL-CIO assigned this latter project to him, beginning, as he said, "when we once go on the payroll of the United Fund * * *." He testified also: that these broad services to union members include assistance in matters involving "Workmen's Compensation, Unemployment Compensation, Social Security, Veterans' problems * *. * aid to the blind, old age assistance * * * aid to dependent children * * * general relief program * * hospitalization (and) the placement of orphan children"; that he works about sixty hours a week, and averages probably four hours weekly on Workmen's Compensation matters and one and one-half hours weekly on Employment Security matters; that the majority of his time is spent in setting up the United Fund programs. He gave no estimates of any time spent on the other many and varied lines of endeavor which he listed. He further testified that the United Fund officials knew of the time which he spent and of his activities before the Divisions of Employment Security and Workmen's Compensation, and that this was "part of the agreement." No official of that Fund was called as a witness.

Our Bar, generally, is reasonably familiar with the nature of proceedings before our Division of Workmen's Compensation, and we shall not outline them in detail. We note, however: that the terms "accident" and "injury" have stated and specific statutory meanings (§ 287.020, RSMo 1959, and V.A.M.S., to which revisions all statutory references will apply); that written notice of injury within 30 days is required (§ 287.420); that the employer is required to file a written Report of Injury (§ 287.-380); and that claim must be filed within one year of injury, with certain exceptions (§ 287.430; § 287.440). In many cases, when the Division at Jefferson City receives a Report of Injury it sets a conference before the nearest "Legal Adviser" and sends out notices to the employee, the employer, and the insurer; at that time it fills in portions of a blank form entitled "Report of Free Legal Aid" and sends this

to the Legal Adviser; this contains the basic information which the Division then has. The testimony of Vernon W. Meyer, the Referee in Charge at St. Louis, giving the reasons for setting such conferences, is apropos: " * * * if it appears from the medical report that the man has sustained any permanent injury or an eye injury of any consequence, or if it appears that there was extensive lost time or if it appears that the Compensation rate is in dispute or if it appears that the employee questions the adequacy of that which is being provided him, either in the way of treatment or Compensation, we set that case for a conference in the St. Louis office, we have a conference set before a Legal Advisor * * *." The nature and effect of the conference which follows is the source of much argument here, pro and con. In any event the parties appear, by counsel or otherwise, no formal claim having been filed, and they discuss the matter; the employer is expected to produce a current medical report. The Legal Adviser is there to advise both parties impartially, and specifically to inform the employee of his rights; he also seeks to promote a voluntary agreement between the parties, either on a rating of permanent partial disability (in which event the matter remains open for the period during which a claim may be filed) or upon an amount to be paid in full settlement and compromise, which forecloses further proceedings. Such conferences are reset if it appears that the disability cannot yet be fully evaluated. The Legal Adviser may not force a settlement, but he may veto one. Among the many questions which arise and are discussed at these conferences, with varying frequency and often with divergent views, are the following: the extent of disability,—including its duration if temporary, and its proper rating if permanent; the evaluation of medical reports; questions of "multiple injuries" and their effect on the body "as a whole"; the consideration of back injuries, head injuries, etc., which are not and cannot be arbitrarily "scheduled" (§

287.190) at so many weeks of compensation; whether there has been an accident and a compensable injury as defined by the law; the consideration of occupational disease as opposed to accidental injury; whether the bar of limitations has run; whether notice was properly given; whether the claim is one which permits resort to a claim under the "Second Injury Fund" (§ 287.220); the wage rate of the employee with possible evaluation of extras or services furnished, and the rate of compensation; whether there is a healing period; disfiguration (§ 287.190); and hernia cases, on which there are specific statutory requirements of proof (§ 287.195). If no agreement is arrived at, the matter is reset or the claimant is advised to file a claim and proceed to a hearing; the Division offers to assist in this. If a final settlement is arrived at, the Legal Adviser endorses at the bottom of the form provided him the amounts already paid, the medical furnished, and the terms of the settlement, and he takes or sends this form immediately to a Referee; the latter, with the parties before him, questions them and if he approves, he dictates the final settlement in accordance with a form which universally recites a dispute or disputes and the compromise thereof. Settlements thus recommended by the Legal Adviser are approved in the great majority of cases. Tod does not appear before the Referee, but he follows the proceedings up to that very point and usually stays around while the settlement is thus being formalized. Ratings of permanent partial disability, as made by the Legal Adviser, are not sent to a Referee for approval, but these fix the final compensation unless reopened later by the filing of a claim. The St. Louis Office of the Division is on the same floor of the Buder Building as Tod's is, though it moved there later.

We shall now narrate Tod's activities in these proceedings; in so doing we have arrived at our own findings from the voluminous evidence, allowing deference to our Commissioner on questions of cred-

ibility. We may say, however, that the great mass of evidence establishing these activities leaves no substantial doubt in our own minds. Many different locals were included in Tod's group and their members worked in a multitude of plants. Tod was shown to have appeared for employees at conferences before the Legal Adviser in approximately 418 cases from 1958 to 1960, inclusive, regardless of eleven prior years beginning in 1944. This was shown by copies of official reports introduced in evidence in which his appearances had been noted. When notice was received by a union member that such a conference was to be held, Tod would be notified, either by a union official, a fellow workman or the employee himself. He would almost universally attend the conference. We find that he there did, with varying regularity, the following things: he examined the injury personally if it was in an available location and he often manipulated, or had the claimant manipulate, a member; he invariably studied the medical report produced by the employer, and its rating or estimate of disability, and he then evaluated the disability in his own mind; when an offer was made by the employer-insurer (as very frequently occurred) he invariably expressed his opinion as to whether or not it was adequate or fair, and whether or not it should be accepted; he sometimes suggested an additional examination at the employer's expense by one of four or five doctors used by employers-insurers and of whom he approved; he rarely produced his own report of medical examination, but on at least one occasion when he did, he refused a further and independent examination; he assumed to know which doctors were fair in their ratings and which were not; he never advised a claimant to consult an attorney except "as a last resort," and when all his own efforts toward a settlement had failed; he discussed, almost invariably, the extent of disability, of whatever type it might be; he took part in discussions as to whether an accident and a compensable injury had occurred; also, whether the period of limitations had run, this with particular reference to payments or medical treatments operating to extend the period; he advised claimants with reference to the bar of limitations; in some instances he argued about the type of medical treatment which would extend the statute and he had a "running dispute" with one employer's attorney on this question; he participated freely in discussions and evaluations of the disability in cases of multiple injuries which could not be evaluated as a matter of mathematics under the statutory schedule of injuries, but are held to affect the "body as a whole"; he often requested and obtained continuances or resettings of conferences; he discussed and advised concerning restrictions on disfigurement (§ 287.190); in at least one instance he objected to the list of wages produced, insisting that the value of tips and of meals furnished should be included, which would affect the rate of compensation; he insisted in one instance on the payment of an employee's transportation costs to a doctor for treatment; he advised claimants of their nonliability for income taxes on their benefits; he has, upon occasion, taken claimants outside the conference room for private conferences when settlement was being discussed, and he occasionally instructed a claimant to "meet me in my office later"; in at least one specific instance he advised an employee to accept a settlement contrary to the expressed advice of the Legal Adviser, and in another did the same thing with regard to a rating offered; in one case, a claimant refused a settlement until he could consult with Tod, after the employer had refused to discuss the case with Tod and he had left; in one case Tod appeared for the wife of a member of one of his unions; he discussed the allowance of an additional 10% for amputation or complete functional loss under the terms of a 1959 statute; he negotiated and finally accepted the compromise settlement of a claim against the "Second Injury Fund," after formal claim was filed against that

fund and it was in the hands of an Assistant Attorney General; this matter involved the interpretation of a new statute and Tod participated right up to the time of its presentation to the Referee, he having finally agreed to accept a sum which he maintained was not enough; and he insisted to a Ford attorney that his employer was liable under the compensation law for an injury suffered by an employee in a basketball game played in a recreational league, because it was paying for the rental of the school gymnasium; and in this connection Tod asked if "we were going to pick up the Bruce Cope matter or whether he would have to file a claim." Many matters went to final compromise settlements before a Referee immediately after Tod's activities terminated; and in all such settlements, according to the Referee in Charge, *"there must be a dispute."* It is also obvious that in very many of these conferences there were disputed questions. The Legal Advisers and one Referee who testified stated that, from their experience, many of the questions discussed involved legal considerations, that the courts had construed the law on many of them, and that often the medical and legal questions could not be disassociated. Tod's appearances and activities have continued up to and during the very time of the Commissioner's hearings, and he has made it clear that he intends to continue these activities unless restrained.

We need not review respondent's testimony in any detail. Generally, he denied advising claimants on legal matters, indicating that he left this to the Legal Adviser. He testified that he "may have" made speeches to his unions about his handling of Workmen's Compensation and Unemployment Compensation matters, and may have made statements at such meetings that he had settled so many cases for so much money. He carries and uses a card on which appear his name, telephone number, address and "Union Referral Center." His apparent justification of his procedure was that he merely evaluated each case by (1)

his own observation of the injury and his questions to the claimant; and (2) his study of the medical report and his knowledge of the doctor and the latter's "reputation"; he said that he then expressed his opinion on the fairness of any offer but left the decision to the claimant. He admitted familiarity with the statutes, both on Workmen's Compensation and Employment Security. He admitted some of the activities shown in the informants' case and as listed herein, and denied others; many acts in specific cases in evidence were passed off with the comment that he could not remember them. We find, as our Commissioner did, that the testimony of the Legal Advisers, the Referee in Charge, and the various employer representatives who had been present at hundreds of these conferences is entirely credible, and that the acts we have listed were performed by Tod.

So far as Tod's Employment Security activities are concerned, it was shown, without dispute, that he appeared with claimants at hearings before the Appeals Referees or "Appeals Tribunals" (after a preliminary finding by a deputy) and there examined and cross-examined witnesses; he admitted that in these matters he advised the claimants "what their rights are under the law." At these hearings a stenographic record is made which forms the basis for any further appeal to the Industrial Commission or to the courts. He also prepared and filed at least one application for review from an Appeals Referee to the Industrial Commission, after participating in the hearing; this involved detailed interpretations of the law concerning the allocation of vacation pay to benefit periods. The hearings, such as Tod regularly attended, involve many phases of the Employment Security Law. They are controversial, since the employer desires to protect his claim experience rating and keep down his taxes, and the claimant, regardless of this, wants compensation. As to these matters Tod apparently relies upon the supposed protection of §·288.380, subd. 5 providing that an individual claiming benefits may be

represented by counsel "or other duly authorized agent," and upon a regulation or rule to the same effect. We shall allude to these later.

It has uniformly been held that our court has the inherent power to regulate and discipline the Bar, to define and declare what is the practice of law, and to prevent the practice of law by laymen or other unauthorized persons. Clark v. Austin, Banc, 340 Mo. 467, 101 S.W.2d 977; In re Richards, Banc, 333 Mo. 907, 63 S.W.2d 672; Hulse et al. v. Criger, Banc, 363 Mo. 26, 247 S.W.2d 855. We have generally recognized that the legislature may, in the exercise of the police power, aid the court by providing penalties for unauthorized practice and for that purpose may define the practice of law, but that it may in no way hinder, interfere with or frustrate the court's inherent power. Clark v. Austin, supra (opinion of Judge Ellison); Liberty Mutual Insurance Co. v. Jones, Banc, 344 Mo. 932, 130 S.W.2d 945, 125 A.L.R. 1149; Hulse v. Criger, supra; Automobile Club of Missouri v. Hoffmeister, Mo.App., 338 S.W. 2d 348. We have at times recognized and used the statutory definition (§ 484.010), as indicated in the various cases already cited; we may undoubtedly do so reserving the right, however, at all times to fix our own boundaries and declare our own restrictions in all matters other than a prosecution under the statute.

The points briefed here by respondent are many and somewhat repetitious. It would be wholly impracticable to deal with each, seriatim. Essentially, they are: that the statutory definition of the practice of law is too "puristic" and should not be followed; that in these enlightened days of expanded administrative and executive procedure, intended to be simple and uncomplicated, laymen must appear before many boards, officers and tribunals; that not every bit of advice or advocacy which may touch the law, or require some knowledge of it, constitutes the practice of law; that particularly in the field of organized labor laymen are required and permitted to negotiate and construe collective bargaining agreements and to appear on grievances, arbitrations, etc. before various bodies; that laymen are permitted in Missouri to appear for casualty insurers at informal conferences in the Division of Workmen's Compensation and that to deny that privilege to Tod would be to set up a double standard; and that Tod's activities were permissible as merely ancillary to his principal business. Other segments of these contentions will be mentioned in the body of this opinion.

Aside from a very few outstate cases Tod's counsel place their reliance firmly on our Liberty Mutual and Hulse v. Criger cases, supra. It has been twenty-two years since this court decided Liberty Mutual, and perhaps it is well to take a new look at it. It involved two essential questions: (1) the activities of lay adjusters in evaluating and settling claims generally, and in taking releases; and (2) the appearances of lay adjusters at "informal conferences" in the Division of Workmen's Compensation. We are not concerned here with (1). The court held, essentially: that § 484.010 (the legislative definition of the "practice of law" and the "law business") was valid and not an interference with the judicial function, and it chose to follow that definition; that the conferences before the Legal Advisers were not adversary in a legal sense (a point which we do not decide here) although recognizing that settlements there reached are regularly approved by Referees; that a Legal Adviser is not a commissioner, referee, etc., "having authority to settle controversies"; that a corporation may only appear in court by a licensed attorney; that the doing by a layman of a single act out of court "that a lawyer might do" will not necessarily convict him of engaging in the "law business"; that in appearing for a single casualty company, an adjuster is not holding himself out to the public as one to be employed for the settling of claims, and that there can therefore be no public injury and no pretense of a fiduciary relationship with any member of the public; that a lay adjus-

ter may repeat to a claimant what his company's attorney has advised as to liability, *but that he shall not state or act upon his own opinion as to the legal rights of the company, the insured or the claimant;* that a lay adjuster may not determine the legal liability of his employer or assured, or pass upon any question of law, although he may express an opinion on the "monetary" extent of the liability; that in attending "informal conferences" the adjuster shall be under the foregoing restrictions. That case was complicated by the existence of a so-called "Code" of procedure adopted by the companies, which the court was seeking to interpret in a declaratory judgment action, and also by the fact that every such company actually retained a licensed resident attorney in each claims office in Missouri whose duty it was to advise the adjusters and others on "all questions of law." No adjuster there acted for more than one single employer-insurer. It would perhaps be presumptuous to comment further on that rather involved opinion, were it not for the fact that we may do so authoritatively. We do not construe it as holding that laymen may advise anyone, at a conference or otherwise, on matters of law or upon rights under the Workmen's Compensation Act, except, perhaps, to act as messengers in conveying specific information which the company attorneys had given. We do not construe it as holding that a layman may evaluate a disability when such evaluation necessitates an application or construction of the Workmen's Compensation Act or the decisions thereunder. We do not construe it as holding that any layman may represent claimants in settlement negotiations, in the conferences or otherwise, and hold himself out as capable of doing so. And we certainly do not regard it as precluding this court from exercising its inherent right to define the practice of law independently when deemed appropriate. As to the casualty adjusters, who are not directly involved here, we merely call attention to the restrictions imposed on the stating of or acting upon their own legal opinions, the

giving of legal advice, and the determination of legal liability, and we note that these restrictions must be rigidly adhered to. There will be no "double standard." So viewing Liberty Mutual, it is of no help to respondent, for he has done many things not permitted there.

There is much in the opinions in the cases of West Virginia State Bar v. Earley, W.Va., 109 S.E.2d 420, and People ex rel. Chicago Bar Ass'n v. Goodman, 366 Ill. 346, 8 N.E.2d 941, 111 A.L.R. 1, certiorari denied 302 U.S. 728, 58 S.Ct. 49, 82 L.Ed. 562, which is relevant to our issues. In each of those cases a layman insisted upon his right to appear and represent claimants in Workmen's Compensation proceedings; in each case, however, the laymen appeared in proceedings before the actual hearing tribunals and took an active part. In both, the courts condemned the acts as the unlawful practice of law. In Earley the court held that a rule of the Commission, purporting to be authorized by statute, permitting a claimant to appear by attorney or agent was invalid in so far as it sought to permit a layman to practice law; it also held that Earley was unlawfully doing so, despite his insistence that such work was merely incidental to his occupation as a Union Business Agent. The latter part of the ruling is of special significance here. The "rule" question was again an issue in Goodman, with the same result; certain language used by the court there is appropriate here (8 N.E.2d 946, 947): "Numerous other cases might well be cited bearing upon the complicated questions and perplexing problems which are the product of the Workmen's Compensation Act of this State. An examination of the above cases involving questions springing from the administration of the Workmen's Compensation Act will readily convince the reader that the field covered by that statute is comprehensive, and that one who practices in that sphere must understand its legal ramifications. * * * It is immaterial whether the acts which constitute the practice of law are done in an office, before a

court, or before an administrative body. The character of the act done, and not the place where it is committed, is the factor which is decisive of whether it constitutes the practice of law." The facts and holding were much the same in McMillen et al. v. McCahan, Ohio Com.Pl., 167 N.E.2d 541. The court there said, at loc. cit. 552: "It is our opinion, that the use of the knowledge of the Workmen's Compensation Law and decisions required to prepare applications and papers pertaining to the Workmen's Compensation Law, in such a way that valuable rights would not be lost, and the giving of advice to clients and all action taken for them in matters connected with the Workmen's Compensation Law, whether or not a fee is charged, constitutes the practice of law in Ohio." Some of the complications which arise in these matters, including the evaluations of various disabilities under our Act, are illustrated in the following Missouri cases: Bumpus v. Massman Const. Co., Mo.App., 145 S.W.2d 458; Dauster v. Star Mfg. Co., Mo.App., 145 S.W.2d 499; Teel v. F. Burkart Mfg. Co., Mo.App., 271 S.W.2d 259; Chapman v. Raftery, Mo.App., 174 S.W.2d 352; Gordon v. Chevrolet-Shell Division of General Motors Corp., Mo.App., 269 S.W.2d 163; Ludwig v. Columbia Brewing Co., Mo. App., 225 S.W.2d 489; Blair v. Armour & Co., Mo.App., 306 S.W.2d 84; Lofton v. Armour & Co., Mo.App., 311 S.W.2d 350.

To the effect, generally, that the character of the act performed, and not the place where it is performed, is the controlling factor, see also: State ex rel. Johnson v. Childe, 147 Neb. 527, 23 N.W.2d 720; In re Baker, 8 N.J. 321, 85 A.2d 505; Stack v. P. G. Garage, Inc., 7 N.J. 118, 80 A.2d 545; Clark v. Reardon, 231 Mo.App. 666, 104 S.W.2d 407. An excellently reasoned opinion on the whole general field, though on different facts, is found in Baker, supra (opinion by Chief Justice Vanderbilt). The courts of several states have held that lay adjusters who take and handle claims *for settlement* and give advice concerning the claimants' rights, are practicing law.

Meunier v. Bernich et al., La.App., 170 So. 567; Fitchette et al. v. Taylor et al., 191 Minn. 582, 254 N.W. 910, 94 A.L.R. 356; Fink et al. v. Peden, 214 Ind. 584, 17 N.E. 2d 95; Rhode Island Bar Ass'n v. Lesser, 68 R.I. 14, 26 A.2d 6; 151 A.L.R. 782, 800. In Meunier and Fink, supra, the respective adjuster apparently handled only a single claim; in Fitchette, he held himself out generally. In Lesser, the acts were done for any member of the public having a fire loss, under the guise of an appraisal; the court there distinguished our Liberty Mutual case, on the ground that the adjusters involved there were acting only for their single respective employers and not for the public, noting also the restrictions on their activities outlined in that opinion. The principle involved in these cases is very material here.

Respondent emphasizes our case of Hulse et al. v. Criger, Banc, 363 Mo. 26, 247 S.W. 2d 855, 862. There the court held that one regularly and actively engaged as a real estate broker could fill in simple legal forms such as contracts of sale, notes, deeds of trust and standard forms of deeds. Such was done, and was permitted to be done, only in connection with real estate transactions in which the broker was directly interested and in which he expected a commission. The court noted that the prompt execution of such instruments was usually necessary in order to facilitate the broker's work, and concluded that these very limited functions were an incidental but *essential* part of his principal vocation, and thus permissible in the public interest. The court then posed as the controlling principle: " * * * whether this really is ancillary to and an essential part of another business * * *." It was specifically held that the broker "may not give advice or opinions as to the legal rights of the parties, as to the legal effect of instruments * * * or as to the validity of title * * *," and that he might not modify standard forms to accomplish different purposes. Granting the full effect of that opinion, it does not help respondent. His vocation was and is that of

a union representative and officer; also, liason representative between his unions and the United Fund. His actual services for the United Fund involved merely the setting up of solicitation and collection programs. That was what he was really paid for. If we disregarded the source of his compensation entirely, it is possible that work performed by him directly for his union organization *as such,* might be considered as incidental to his employment. But here, he cannot and does not represent the *unions* before these Divisions; the unions are not parties to the proceedings, and cannot be parties. He has simply assumed to represent, as a *courtesy* to the union (he says), out of the "goodness" of his heart, and *free* (he says), a segment of the public,— namely, any and all members of his multitudinous locals in their private, individual claims. That activity is not reasonably incidental to his vocation and it is most certainly not *essential,* either to his work for United Fund or to his representation of the *unions.* In this connection we note the case of In re Brotherhood of Railroad Trainmen, 13 Ill.2d 391, 150 N.E.2d 163, 165. There the Brotherhood through a "Legal Aid Department," regional investigators and regional counsel, got in touch very promptly with all members who suffered personal injuries in their work; it immediately presented contracts providing for the employment of the regional counsel, tendered free legal advice, and urged the employment of such pre-selected counsel, with more or less pressure. Costs, investigation expenses, medical examinations, and all trial and appellate expenses were paid by the regional counsel in cases where the services were accepted, along with the expense of maintaining the "Legal Aid Department." The Brotherhood insisted that it was merely protecting and representing its members against the undesirable activities of outsiders, and that it was permitted by law to do so. The court held the activities illegal, and in the course of the opinion said, 150 N.E.2d loc. cit. 166, 167: "As a matter of law it argues that its method of handling the personal injury and death claims of its members is permissible because under the Railway Labor Act, 45 U.S.C.A. § 151 et seq., the Brotherhood is authorized to represent its members, before the National Railroad Adjustment Board or other appropriate tribunals, in the processing of disputes growing out of grievances. (45 U.S.C. 152, 45 U.S.C.A. § 152.) But these injury and death claims are not the kind of labor disputes that the statute contemplates. We find nothing to suggest that Congress intended by the Railway Labor Act, any more than by the Labor Management Relations Act (29 U.S.C. 141, 29 U.S.C.A. § 141) to overthrow State regulation of the legal profession and the unauthorized practice of the law. * * * The Brotherhood has a legitimate interest in investigating the circumstances under which one of its members has been injured. That interest antedates the occurrence of any particular injury. We are of the opinion that the Brotherhood may properly maintain a staff to investigate injuries to its members. It may so conduct those investigations that their results are of maximum value to its members in prosecuting their individual claims, and it may make the reports of those investigations available to the injured man or his survivors. Such investigations can be financed directly and without undue burden by the 218,000 members of the Brotherhood.

"The Brotherhood may also make known to its members generally, and to injured members and their survivors in particular, first, the advisability of obtaining legal advice before making a settlement and second, the names of attorneys who, in its opinion, have the capacity to handle such claims successfully." We have noted this case particularly because of its limitations upon the activities of the Brotherhood (or union) on behalf of its members, although recognizing a divergence in the facts.

Respondent also relies on the following cases: Lowell Bar Ass'n et al. v. Loeb et al., 315 Mass. 176, 52 N.E.2d 27; Goodman

v. Beall, 130 Ohio St. 427, 200 N.E. 470; Shortz v. Farrell, 327 Pa. 81, 193 A. 20. In Lowell, supra, the court merely recognized (as in Hulse v. Criger) that not every act which might involve some legal knowledge would constitute the practice of law if, in fact, it was something strictly incidental to one's regular vocation. That case involved the preparation of simple (salary and wage) income tax returns by laymen. The principles announced there are really no different from our holding in Hulse v. Criger. Goodman v. Beall, supra, involved Workmen's Compensation proceedings in Ohio; it was held that a layman might appear in certain preliminary proceedings but specific descriptions of the activities are not given, and there appear to be differences in the procedures there and in Missouri. The action was one in prohibition against the Industrial Commission itself. The court recognized that acts involving "legal problems" in presenting claims would be improper, and there was no consideration of the matter of settlements. In Shortz v. Farrell, supra, the defendant was an adjuster for a single casualty insurer; it was held that he was practicing illegally when he participated in Workmen's Compensation hearings for his employer, but that he could fill in and file simple forms as provided, where no legal skill was required; also, that it was when the hearing began that representation would constitute the practice of law. The court there said (193 A. loc. cit. 21): "Where the application of legal knowledge and technique is required, the activity constitutes such practice even if conducted before a so-called administrative board or commission. It is the character of the act, and not the place where it is performed, which is the decisive factor." We do not find that any of these cases is applicable to or persuasive of Tod's situation here. One amici urges consideration of: Petition of Ingham County Bar Ass'n v. Walter Neller Co., 342 Mich. 214, 69 N.W.2d 713, 53 A.L.R.2d 777; and Auerbacher et al. v. Wood, 142 N.J.Eq. 484, 59 A. 2d 863. Neither opinion really adds any-

thing to our decision in Hulse v. Criger, which we have already discussed fully. And we comment here that this particular brief seems largely to miss the vital distinction between the representation of a *union* in administrative proceedings by designated lay members or officials (where the union is directly involved) and the representation by laymen of members of the *public*, who happen also to be members of the union, in proceedings where they are parties as *individuals*, and the union is not a party.

As sundry opinions have already suggested, it is probab'y unwise to attempt an all-inclusive definition of the practice of law or of the law business. We may follow our statute (§ 484.010) or not, as this is not a prosecution for its violation. We have concluded that Tod's acts have and do constitute the doing of a "law business," under the statute and also constitute the practice of law under any sound independent definition. We omit consideration of the first paragraph of the statute defining the "practice of law" because of the construction in Liberty Mutual to the general effect that the commissioners, referees, boards, etc., referred to therein must have "authority to settle controversies." It is unnecessary to pursue that question here. The second paragraph of the statute defining the "law business," is as follows: "2. The 'law business' is hereby defined to be and is the advising or counseling for a valuable consideration of any person, firm, association, or corporation as to any secular law or the drawing or the procuring of or assisting in the drawing for a valuable consideration of any paper, document or instrument affecting or relating to secular rights or the doing of any act for a valuable consideration in a representative capacity, obtaining or tending to obtain or securing or tending to secure for any person, firm, association or corporation any property or property rights whatsoever." Here Tod has been "advising or counseling for a valuable consideration" many persons as to secular law over a period of fourteen years, and he has been doing acts for a

valuable consideration in a representative capacity which have obtained or tended to obtain property or property rights. Those acts constitute doing a "law business" under the statute. We do not accept Tod's statement that he is doing all this work *free* and out of the *goodness* of his heart; he is paid a substantial salary by the United Fund; if he, or his unions, choose to throw in other duties at the expense of the United Fund and under one general compensation, he being the designated union representative, these become a part of his work for which he receives compensation, directly or indirectly. He would not receive his present salary at all unless his unions had designated him as "Community Services Representative" and had thus indirectly provided him a salary; that being true, they may assign additional duties if they choose. By his own testimony Tod states that the United Fund agreed to these activities. In other words, the unions and their members may be getting a "free ride" on these services, but Tod is actually being paid one lump compensation for all his activities. See, generally, on the broad construction of "consideration," in a similar connection: State ex inf. Miller v. St. Louis Union Trust Co., 335 Mo. 845, 74 S.W.2d 348.

■ Wholly apart from the statute, Tod has been practicing law and herein we do not consider further the somewhat hypertechnical differentiations between that and the "law business." He has long engaged in the business of, and has *held himself out* as being capable of, advising members of the public as to their rights under the Workmen's Compensation Law including the evaluation of their claims, legally and otherwise, and he has regularly negotiated and brought about, through his advocacy, compromise settlements of a multitude of such claims. This can be nothing other than the practice of law. In Clark v. Austin, Banc, 340 Mo. 467, 101 S.W.2d 977, loc. cit. 982, the court said: "Otherwise stated, one who, in a representative capacity, engages in the business of advising clients as to their rights under the law, or while so en-gaged, performs any act or acts either in court or outside of court for that purpose, is engaged in the practice of law." While not all-inclusive, that definition covers this case. A careful study of this record leaves no doubt that Tod actually formed, stated and argued his opinions on the evaluations of these various disabilities *under the Compensation Act,* and that the factual, medical and legal questions could often not be disassociated. As Mr. Green, the Legal Adviser, testified: "There is a medical distinction there as to what a doctor might think an injury is worth and there is also a legal distinction there as to what the Commission and the Courts feel that such a thing is worth." What Tod actually *did* over this period of years, as so well known to all concerned, constituted as effective a "holding out" of himself to that segment of the public as one capable of performing the functions of a lawyer, as any words he might have used.

■ We have held that Tod received consideration, but we also hold that, on this record, he was illegally practicing law, whether he received consideration therefor or not. Clark v. Reardon, 231 Mo.App. 666, 104 S.W.2d 407; In re Baker, 8 N.J. 321, 85 A.2d 505; People ex rel. Attorney General v. Jersin, 101 Colo. 406, 74 P.2d 668; Niklaus v. Abel Construction Co., 164 Neb. 842, 83 N.W.2d 904. In our view it is unnecessary here to consider anew whether the proceedings before the Legal Adviser were or are "adversary." Tod's actions, whether performed in that office, at his "clients' " homes, in the employers' plants, or on the street, constituted the practice of law.

There is no question before us involving the legality of any activities of laymen in labor negotiations, labor contract interpretations, or grievance procedure, nor does this opinion affect such matters. And we have here no situation where a union, itself, appeared as a party. Counsel suggest that in these enlightened days with so many administrative tribunals, simplified procedures, and enlarged executive functions,

when laymen of necessity must appear as experts before many officials and boards, our definition of the practice of law must not be "static," and that it must move along with the times. We recognize full well this profusion of administrative tribunals, of lay "experts" and specialists, and of multiplied governmental functions; many, of course, are federally created and operate under federal laws and regulations. These developments, from whatever perspective we view them, have not relieved or deprived this court of its inherent duty and power to determine what is and what is not the practice of law, and we expect to take each case on its own facts, as it appears, and decide that question for ourselves. Indeed, this very profusion of boards, commissions and so-called lay "experts" would seem to require a closer look by the courts at some of these fringe areas, if indeed we are to provide adequately supervised representation for the public in matters which are inherently legal. We are not persuaded by the argument that most of these employee claims which Tod handled are small and wholly undesirable from a lawyer's standpoint. As stated in Hulse et al. v. Criger, Banc, 363 Mo. 26, 247 S.W.2d at loc. cit. 857–858: "The duty of this Court is not to protect the Bar from competition but to protect the public from being advised or represented in legal matters by incompetent or unreliable persons. Our purpose must be to make sure 'that legal services required by the public, and essential to the administration of justice, will be rendered by those who have been found by investigation to be properly prepared to do so by conforming to strict educational standards, and who demonstrate that they have the character to conform to higher standards of ethical conduct than are ordinarily considered necessary in business relations which do not involve the same fiduciary and confidential relationships.' Curry v. Dahlberg, 341 Mo. 897, 110 S.W.2d 742, 112 S.W.2d 345, 346." If we should relegate any portion of the practice of law to laymen on the theory that they are qualified as "experts,"

—who, may we ask, would determine their qualifications and integrity? And the fact that Tod has, on his own assertion, had "no complaints," does not irrevocably assure that all of his "clients" have had that type of representation that a skilled lawyer could render.

Tod's activities in the field of Employment Security may be considered very briefly. He regularly attended and participated in various hearings of record before Appeals Referees and advised employees "as to what their rights are under the Unemployment Compensation Law." This is conceded. There can be no substantial doubt that this was the practice of law. Tod's reliance upon § 288.380, subd. 5 and the rule enacted thereunder is wholly unavailing. In so far as that subsection of the statutes purports to permit a layman to appear before these tribunals as a "duly authorized agent," and to do there what we deem to be the practice of law, it is wholly void, as is the rule enacted thereunder.

The Commissioner has recommended that Tod be adjudged guilty of contempt and fined $50 therefor, in addition to the imposition of our injunction and all costs. Tod's conduct, in continuing his stated activities during the very hearings with full knowledge of these formal charges has not been commendable, to say the least. Two Attorneys General had furnished opinions to the Division of Workmen's Compensation in February 1947 and in January 1960, to the general effect the laymen might appear at the so-called "informal conferences" and " * * * determine the pecuniary limit of one of the parties in a settlement if they arrive at their conclusion either regardless of legal liability or upon advice of counsel, but that they may not state or act upon their own opinion as to the legal rights * * *." Tod claimed that he knew of at least one of these opinions; they were offered in evidence but the Commissioner excluded them. Actually, they add nothing to the holdings of Liberty Mutual. So far as the merits are concerned, they are and

were wholly immaterial in this proceeding. We have independently considered them solely on the charge of contempt. However, even casually, they furnish no excuse for the doing of the various things which Tod did. It has been said that contempt " * * * must be measured by the intent with which it is committed." State on Inf. of McKittrick, Attorney General v. Koon et al., Banc, 356 Mo. 284, 201 S.W.2d 446, 457. On the other hand it has been stated that the offense depends on the nature of the act and not on the presence of an actual intent. 17 C.J.S. Contempt § 8, p. 10. It seems apparent that one's good faith, or the lack of it, should be considered. Ex parte Howell et al., 273 Mo. 96, 200 S.W. 65; Bender v. Young, Mo., 252 S.W. 691. Tod's acts speak of no real good faith. We find him guilty of contempt. See, generally, Clark v. Austin, Banc, 340 Mo. 467, 101 S. W.2d 977; Clark v. Reardon, 231 Mo.App. 666, 104 S.W.2d 407.

It is ordered and adjudged that respondent Edward M. Tod be, and he is hereby, permanently enjoined and restrained from doing and performing any of the following acts or things, to wit:

1. Appearing at or participating in any way, in a representative capacity for any party, in proceedings before any Appeals Tribunal in the Division of Employment Security; advising claimants in any way concerning their rights under the Employment Security Laws; preparing or assisting in the preparation of applications for review of any decisions of any such Tribunals, or advising thereon; representing or holding himself out, directly or indirectly, as a person competent to do any of said things.

2. In matters involving claimants or prospective claimants, formal or informal, to benefits under the Workmen's Compensation Laws (Ch. 287, RSMo 1959 and V.A.M. S.), he is so enjoined and restrained from

(a) participating in a representative capacity in negotiations for the settlement, adjustment, or compromise of any such claims, filed or unfiled, pending or prospective, before any Legal Adviser or Referee of said Division or elsewhere; expressing any opinion, or making any recommendation to or advising any claimant, employee, employer, insurer or official of the Division as to the fairness or adequacy or the unfairness or inadequacy under the law, of any offer made; expressing to any such person or persons any evaluation of any such claim of which the monetary value depends in any way upon an application or construction of the Workmen's Compensation Law of Missouri, either statutory or resting in court decisions; otherwise advising any party or parties of his or their rights under the law; and in any way representng or holding himself out to the public, or to any part thereof, directly or indirectly, as competent to do any of the things forbidden in this subparagraph (a).

(b) Without limitation upon any of the foregoing: from advising employees as claimants or prospective claimants or expressing opinions or presenting arguments, directly or by inference, to them or any of them, to a Legal Adviser or Referee, to an employer, or to an insurer, on any of the following: whether an "accident" has occurred within the law; whether a claim would be or is barred by limitations; the evaluation of cases involving multiple injuries; whether an injury or disability or disease is compensable under the law; whether any payment for disfigurement should be made; whether the "Second Injury Fund" provisions are or are not applicable or concerning their application; what the legal wage rate is or was, if payable in anything other than money to be computed mathematically, or what the rate of compensation is or should be; the meaning or effect of any Workmen's Compensation statute or statutes or any appropriate action thereunder; ratings of permanent disability, partial or total.

(c) From seeking or procuring any setting, resetting or continuance of any conference or hearing; from representing or holding himself out, directly or indirectly,

as a person competent to advise claimants or prospective claimants of their rights under the Workmen's Compensation Law, or any phase thereof, or to negotiate settlements of any claim thereunder.

As used in this order, the term "public" shall include the members of the various unions which respondent represents. All costs herein are taxed against the respondent; for any balance thereof, over and above respondent's deposits, execution shall issue.

Edward M. Tod is hereby adjudged guilty of contempt of this court as charged. His punishment is fixed at a fine of $250, and in default of payment thereof he shall be imprisoned in the jail of the County of Cole, State of Missouri, for a term of thirty days. See § 476.120.

All concur.